BRATTON, ETC., ET AL. *v.* SMITH, ET AL.

[No. 180, September Term, 1969.]

*Decided February 10, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Stanley Getz,* with whom were *Getz, Getz & Getz* on the brief, for appellants.

*Charles H. Reed, Jr.,* with whom were *Charles B. Keenan, Jr.* and *Cameron & Reed* on the brief, for Charles Carmen Gamatoria and The Chesapeake & Potomac Telephone Company of Maryland, part of appellees; and by *Louis G. Close, Jr.,* with whom were *Due, Whiteford, Taylor & Preston* on the brief, for James Claude Smith, other appellee.

FINAN, J., delivered the opinion of the Court.

As the result of a tragic, fatal accident, the widow of the decedent, Raby James Bratton, to her own use and to the use of two surviving infant children (appellants), brought suit against James Claude Smith, Charles Carmen Gamatoria, and the Chesapeake & Potomac Telephone Co. of Maryland (appellees). The following facts gave rise to the action.

During the early afternoon of November 4, 1966, the defendant James Claude Smith, a tenant farmer, who from time to time employed the deceased to assist him in general farm work, was engaged with the deceased in moving a farm tractor and a loaded hay wagon from a field on defendant Smith's farm to a field on Smith's brother's farm, located in Harford County, on Maryland Route 543, approximately one-half mile distant. Smith and the deceased attached the loaded hay wagon to the tractor. The tractor was 7 feet 8 inches high, 7 feet wide and 11 feet 8 inches long. The wagon was 10 feet high from the top of the panel to the ground, 7 feet 1 inch in width and 19 feet 8 inches in length. The overall length of tractor and wagon was 34 feet 4 inches. The wagon was partially filled with hay. The two units were coupled together by a drawbar. The drawbar plays a vital part

in the assessment of the quality of the subsequent action of the deceased and we therefore describe it in some detail. It was a detachable device made of smooth steel. Its top surface was 28 inches in width and 2¾ inches fore and aft, as it fit between the tractor and the wagon. It had a raised plate in the middle approximately 6 inches wide and ¾ths of an inch high. The plate was pierced by two bolts side by side and had, in addition, another hole through which a tow-pin was dropped to pull the wagon. If a person chose to stand on the drawbar, astride its center, it would afford a place for each foot on two smooth steel areas 11 inches by 2¾ inches, or if one chose to stand on either side of the center of the drawbar, discounting the fact that he may be off balance, he would have to place both feet on a bar 11 inches by 2¾ inches. The deceased was a man 6 feet tall; however, we do not know the size of his shoe.

As the tractor and wagon proceeded toward Smith's brother's farm, the deceased chose to stand, balanced or perched on the drawbar between the tractor and the hay wagon. The tractor was equipped with only one seat which was occupied by the defendant Smith who was operating it. There was ample room in the hay wagon for the deceased had he elected to ride there, but of his own volition he chose the drawbar. There was evidence that farm hands frequently rode on the drawbar and also that at times they rode in the wagon. This applied at various times to the deceased. The only method of holding on while standing on the drawbar was either to hold onto the sides of the tractor seat or other devices on the tractor, none of which were specifically designed for the purpose of affording a grip. We would further add that the drawbar had some play in it and that changes in acceleration, deceleration, bumps and changes in direction of the rig would all be felt on the drawbar, which was the link between the tractor and the hay wagon and through which was inserted the heavy towing pin that pierced the raised plate on the drawbar and the slotted wagon tongue of the hay wagon.

As the tractor and hay wagon, which we will call the farm rig, proceeded down Maryland State Route 543 towards the lane which led to Smith's brother's farm it was traveling approximately 10 to 12 miles per hour. For a short distance prior to the accident a Ford panel truck owned by the Telephone Company, and driven by its employee the defendant Gamatoria, had been following the farm rig. At the point of the accident Route 543 is 18 feet wide with no center line or lane markings and it accommodates traffic traveling in both directions. The farm rig was traveling south, and on the westerly side of the highway there is an unimproved shoulder 4 feet in width, and on the easterly side, an unimproved shoulder 5 feet in width. The roadbed proper is macadam surface and was dry at the time of the accident. Gamatoria was cautiously approaching the farm rig preparing to pass. He could see neither the tractor driver nor anyone else because the hay load on the wagon obstructed his view. As he approached, his way ahead was clear for a distance of one-half mile or more with no oncoming traffic. At this point both the tractor and the hay wagon were "pretty well on the right." Gamatoria states that under the circumstances he did not think it was necessary for him to blow his horn. The tractor and wagon were not equipped with any kind of a rear view mirror or directional signals, nor is any required on this type of farm equipment pursuant to Maryland Code (1967 Repl. Vol.), Art. 66½, § 270(b). While in the process of passing, Gamatoria had reached a point where his front wheels were even with the rear wheels of the hay wagon when the tractor made a slight movement to the left, which Smith described as necessary to permit him to see behind without moving the tractor too much. At no time did Gamatoria observe any hand signals. Smith testified that he made this move in preparation to turn left into the lane leading to his brother's farm some 300 feet down the highway. He states that at the moment of confrontation, the telephone truck was one-half or two-thirds of the way towards the front of the hay wagon. There is no

evidence that Smith's movement caused the tractor or hay wagon to cross the imaginary center line of the highway, but his movement was sufficient to prompt Gamatoria to pull smartly to his left off the side of the road and stop his truck. At the same time Smith's reaction to this confrontation was to pull abruptly to the right. After turning to his right Smith proceeded off the traveled portion of the highway, continued off the westerly shoulder, ultimately striking and traversing at an angle an embankment adjoining the westerly shoulder of the road. There was never any physical contact between the vehicles involved.

Because of the sudden and unexpected operation of the tractor, the deceased was thrown or hurled from the tractor drawbar onto the westerly shoulder of the highway and was run over by the wheels of the hay wagon as the result of which his skull was crushed. There was some evidence from the blood marks near the highway that he had been dragged 15 to 16 feet. The decedent's body came to rest 34 feet from the point where the tractor first left the traveled portion of the highway. There was no conclusive evidence to indicate when or why the deceased became separated from the tractor, that is, whether the fall was occasioned by the abrupt movement of the tractor at the moment of the confrontation with Gamatoria as distinguished from any other movement made by the tractor. Gamatoria testified that after the tractor turned to the right, the farm rig fishtailed down the road. When Gamatoria, after stopping, embarked from his truck and went over to the farm rig, the defendant Smith was shouting excitedly about there being another man on the rig. Gamatoria looked back and saw Bratton's body along the highway.

At the conclusion of the entire testimony the Circuit Court for Harford County granted a motion for a directed verdict on behalf of the defendants Gamatoria and his employer, the Telephone Company. The jury was instructed by the court to consider the presence or absence of primary negligence on the part of James Claude Smith

and the presence or absence of contributory negligence on the part of the deceased. After deliberating, the jury returned a verdict for defendant Smith.

On appeal the plaintiffs challenged the granting of the directed verdict for Gamatoria and the Telephone Company, on the ground that Gamatoria was guilty of negligence in not sounding his horn when attempting to pass the tractor and hay wagon, relying on their interpretation of Maryland Code (1967 Repl. Vol.), Art. 66½, § 293. The appellants in appealing the verdict of the jury in favor of the defendant Smith, contend that the court erred in not instructing the jury, (1) that the deceased was entitled to the presumption that he was exercising due care on behalf of his own safety at the time of the accident, and (2) that the defendant Smith should have given an appropriate turn signal when making his movement to the left, as provided by Maryland Code (1967 Repl. Vol.) Art. 66½, § 228(a).

For the reasons which we shall hereafter set forth, we think the judgments of the lower court should be affirmed.

First, with regard to the directed verdict in favor of the defendants Gamatoria and the Telephone Company, we think the statute does not obligate the overtaking driver to sound his horn in every case but only when it appears reasonably necessary. *Smith v. Transport*, 211 Md. 134, 139, 126 A. 2d 584 (1956). Art. 66½, § 293(a) reads in pertinent part:

> "The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with his horn, but shall not otherwise use such horn when upon a highway."

As was stated by Judge Dyer in his opinion rendered in support of his denial of the plaintiff's motion for a new trial:

> "There is no duty on the part of the overtaking motorist to sound his horn when there is

no apparent necessity to do so, i.e. when the overtaken vehicle is proceeding in his own lane and leaving sufficient clearance for the overtaking vehicle to pass. There was no evidence in the present case which would permit reasonable men to conclude that Gamatoria was negligent in not sounding his horn prior to passing Smith."

See also *Cantrell v. H. G. Hill Stores* (La. App.) 193 So. 389, 392, (1940), wherein the Court construed a statute similar to ours to be for the purpose of creating an obligation on the part of the overtaken vehicle to move to the right if necessary to afford room for passing, rather than to require a horn to be blown by the overtaking vehicle when the overtaken vehicle is already sufficiently far to the right to permit passage.

Next we shall discuss the alleged errors in the court's instructions to the jury. The only contention of the appellants which bears a semblance of merit is that regarding the presumption of due care which normally exists in favor of a deceased plaintiff. In the recent case of *Gresham v. Commissioner of Motor Vehicles*, 256 Md. 500, 260 A. 2d 649 (1970), we had occasion to discuss this presumption which unquestionably exists in favor of a deceased plaintiff in the absence of countervailing evidence. We think the effect of this presumption was analysed and its qualifications articulated by this Court in *Grier v. Rosenberg*, 213 Md. 248, 131 A. 2d 737 (1957), a case which involved the presumption of agency arising from the ownership of a motor vehicle; however, Judge Prescott (later Chief Judge) in the opinion went to the core of the evidentiary effect and purpose of presumptions in general. In *State, Use of Geils v. Baltimore Transit Company*, 329 F. 2d 738 (4th Cir., 1964), wherein the presumption of due care in favor of a deceased plaintiff was the point upon which the case turned, the majority opinion relied heavily on *Grier*, assessing it as "the principal Maryland case on this point * * *."

While recognizing that *Grier* dealt with the presump-

tion of agency, nonetheless its holding, as we stated in *Gresham, supra,* is apposite to the principle underpinning the use of presumptions. Therefore, applying the language of *Grier, supra, Id.* at 254, 255, in context with the presumption in the case at bar, we would give it the following interpretation. We begin with recognizing the presumption of due care existing in favor of the deceased. If there is countervailing evidence that is so slight as to be insufficient to be considered by the jury in rebuttal of the presumption, the court should grant an instruction giving full benefit of the presumption of due care to the plaintiff. On the other hand, the countervailing evidence may be so conclusive that it shifts the burden or duty of going forward with the evidence back to the plaintiff, in which event the defendant would be entitled to a directed verdict, if the plaintiff does not produce evidence in reply, unless there is already evidence in the case tending to contradict the defendant's evidence. Again, there may be times when the evidence may fall between the two categories mentioned above, in which event the issue of due care should be submitted to the jury. And as the court concluded in *Grier*:

> "* * * It would be difficult, if not impossible, to lay down a rule, that would apply in all cases, as to when the evidence is so slight that it is insufficient to be considered by the jury in rebuttal of the presumption of agency, or so conclusive as to require a directed verdict for the defendant. These matters must depend upon, and be decided by, the facts developed in each individual case." *Id.* at 255.

Reviewing the cases wherein the question of the presumption of the deceased plaintiff exercising due care on the part of his own safety is involved, from its first mention in the Maryland Reports in *Northern Cent. R. Co. v. State, for Use of Geis,* 31 Md. 357, 364 (1869) to *Nizer v. Phelps,* 252 Md. 185, 205, 249 A. 2d 112 (1969), and *Gresham, supra,* we would say in sum, that the presump-

tion of the exercise of due care on the part of the deceased plaintiff prevails, but that it may be undermined, or completely dissipated, by countervailing evidence. The court's instruction based on the facts of each case, should reflect to what extent, if any, the countervailing evidence has affected the presumption.

In the instant case, had the deceased been riding in the hay wagon itself or at some other place, which the minds of reasonable men would conclude to be safe, then he certainly would have been entitled to the benefit of the presumption that he was exercising due care for his own safety at the time of the accident. However, the countervailing evidence which consisted of the deceased's voluntary election to ride standing on the drawbar, overcame the presumption. We would at this point observe, that in the instant case the questions of contributory negligence and the assumption of risk, insofar as the deceased is concerned, are closely parallel.

> "Contributory negligence, of course, means negligence which contributes to cause a particular accident which occurs, while assumption of risk of accident means [voluntarily incurring the risk of] an accident which may not occur, and which the person assuming the risk may be careful to avoid after starting. Contributory negligence defeats recovery because it is a proximate cause of the accident which happens, but assumption of the risk defeats recovery because it is a previous abandonment of the right to complain if an accident occurs." *Baltimore Transit Co. v. Sun Cab Co.*, 210 Md. 555, 562 (1955).

We are of the opinion that in the instant case the actions of the deceased with respect to his own safety, no matter how we may characterize them, were such as not to have entitled the plaintiff to an instruction that the deceased was using due care for his own safety at the time of the accident. We think the trial judge was correct in refusing such an instruction and indeed that, it

would not have been error had he granted a directed verdict for the defendant Smith on the basis of the contributory negligence of the deceased, although we neither need nor intend to terminate this opinion with such a holding. It suffices to say, that we think the lower court was generous with the instruction that it did give, which left the question of contributory negligence to the jury. This is particularly true in view of the language of our predecessors in *Richardson v. State*, 203 Md. 426, 432, 101 A. 2d 213 (1953), wherein this Court stated:

> "* * * We accept the rule that a passenger in a motor vehicle who, without some reasonable necessity or excuse, rides in a place or position which he knows, or in the exercise of ordinary care ought to know, exposes him to danger, is ordinarily guilty of contributory negligence, if such conduct contributes proximately to cause his injuries."

See also *Gellerson v. Rasins*, 248 Md. 75, 79, 234 A. 2d 758 (1967), and *Tidd v. New York Cent. R. Co.*, 132 Ohio St. 531, 9 N.E.2d 509 (1937).

Finally, we come to the appellants' contention that the lower court committed error in failing to instruct the jury that in determining the negligence of the defendant Smith, they should consider whether the movement of his vehicle from a direct course was made with reasonable care and after giving an appropriate signal, as provided by Code, Art. 66½, § 228(a).

Although the jury brought in a verdict in favor of the defendant Smith, since there were no separate issues submitted to the jury, we have no way of knowing whether they arrived at their verdict on the basis of the absence of primary negligence on the part of defendant Smith, or on the basis of contributory negligence on the part of the deceased. If we could be certain that it was on the basis of contributory negligence on the part of the deceased, then we could have concluded this opinion at an early stage. However, being deprived of any certain

knowledge as to the basis for the jury's verdict for the defendant, we must again view Smith's actions in light of the language of the statute. Art. 66½, § 228(a) provides:

> "(a) Turning—No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety and then giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by such movement."

In our mind there is no question but that § 228(a) quoted above relates to the duties and obligations of the operator of a motor vehicle to another operator approaching him from the rear. The statute was not meant to directly relate to the duties and obligations of the operator to his passengers. We think the lower court was correct in declining to incorporate this statutory provision in its instructions to the jury. We think this is buttressed by the fact that there is no evidence that the defendant Smith, although making a move with his tractor to the left, ever crossed the center of the highway. The testimony indicates that he made this slight movement to the left, not for the purpose of turning off the highway but to enable him to see to his rear, in preparation for making a turn to the left onto the lane to his brother's farm, which lane was some 300 feet from where the confrontation occurred.

In fact, we think that the lower court was amply fair in granting the instruction on reckless driving, which left it to the jury to decide whether the defendant Smith, "immediately prior to the incident referred to in the evidence, was operating his vehicle recklessly having regard to the width, the traffic and the use of the highway or was operating his vehicle so as to endanger the property, life or limb of any person. * * *"

We think that the questions of whether the defendant Smith was guilty of primary negligence and whether the

deceased was guilty of contributory negligence, were squarely before the jury. As we have previously stated, we have no way of knowing whether the jury found an absence of negligence on the part of Smith, or whether, despite negligence on his part, they determined that the deceased, when electing to stand on the drawbar, chose to stand on the razor's edge. In any event the judgments of the lower court must be affirmed.

*Judgments affirmed, appellants to pay costs.*