526 A.2d 87

Danielle CASPER, an infant, etc. et al.

v.

CHAS. F. SMITH & SON, INC. et al.

Rachel KIRTSCHER, an infant, etc. et al.

v.

CHAS. F. SMITH & SON, INC. et al.

Nos. 1217, 1218, Sept. Term, 1986.

Court of Special Appeals of Maryland.

June 5, 1987.

446

Phillips P. O'Shaughnessy (James M. Gabler, C. James Sfekas and Sandbower, Gabler & O'Shaughnessy, P.A. on the brief), Baltimore, for appellants.

William R. Phelan, Asst. City Solicitor (Benjamin L. Brown, City Solicitor on the brief), Baltimore, for appellee, Mayor and City Council of Baltimore.

Michael P. Chervenak (Francis J. Ford and Ford & O'Neill on the brief), Rockville, for appellee, Gabion Const., Inc.

Donald J. McCartney (Connie E. Williams and Smith, Somerville & Case on the brief), Baltimore, for appellee, Rummel, Klepper & Kahl.

Argued before ALPERT and ROSALYN B. BELL, JJ., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

ROSALYN B. BELL, Judge.

The wisdom contained in *Demuth v. Old Town Bank of Baltimore*, 85 Md. 315, 319–20, 37 A. 266 (1897), is worth repeating once again:

"This is a case of exceedingly great hardship, and we have diligently, but in vain, sought for some tenable ground upon which the appellants could be relieved from the loss that an affirmance of the decree appealed from will necessarily subject them to. But hard cases, it has often been said, almost always make bad law; and hence it is, in the end, far better that the established rules of law should be strictly applied, even though in particular instances serious loss may be thereby inflicted on some individuals, than that by subtle distinctions invented and resorted to solely to escape such consequences, long settled and firmly fixed doctrines should be shaken, questioned, confused or doubted. It is often difficult to resist the influence which a palpable hardship is calculated to exert; but a rigid adherence to fundamental principles at all times and a stern insensibility to the results which an unvarying enforcement of those principles may occasionally entail, are the surest, if not the only, means by which stability and certainty in the administration of the law may be secured." (Citation omitted.)

Danielle Casper, aged seven, and Rachel Kirtscher, aged eight, were severely and permanently injured in 1984 when they fell into Moore's Run, a stream located in Baltimore City, and were submerged in icy water. As a result, both children are profoundly brain damaged and suffer from, among other conditions, spastic quadriplegia. The parents of the girls filed negligence suits individually and on behalf of the children against the City and several contractors and engineers who had done some excavation of the stream nine years earlier. The Circuit Court for Baltimore City granted

judgment in favor of all but one of the defendants.[1] The parents appeal the court's rulings.

Since the cases were decided on motions to dismiss or for summary judgment, the facts are taken from the parents' complaints and are presumed to be true. The events of this tragedy began nine years earlier when in August, 1974 the City of Baltimore awarded a contract to Chas. F. Smith & Son, Inc. to perform, as the plaintiffs alleged, "sewer construction and repair" around Moore's Run. This work included the installation of a 21–inch sewer line to run parallel to Moore's Run.

The contract also required the construction of gabions for 200 feet along the west bank of Moore's Run. Gabions are wire mesh baskets filled with rocks and are used to prevent erosion. The design for the gabions required a ten-foot-wide-by-one-foot-deep "mattress" to be erected on top of the streambed, with two layers of cubical wire baskets to be placed on top of the mattress along the western bank. The baskets were to be filled with igneous rock of a specific gravity not found locally. The parents asserted the main purpose for installing the gabions "was to prevent erosion of the west bank of Moore's Run so as to protect the 21″ sewer pipe and [a nearby road] from collapse and destruction." In March and April, 1975, Smith and Gabion Construction, Inc. (GCI) constructed the gabions under the supervision of the City and Rummel, Klepper & Kahl (RKK), the engineering consultant and project manager.

Prior to construction, the streambed of Moore's Run at the accident site was approximately six inches to one foot deep. The parents alleged that Smith and GCI altered the depth by improperly excavating rock from the streambed to fill the gabion baskets. In so doing, they created a five-foot-deep pocket of water running the length of the gabion construction. The plaintiffs also stated that Smith and GCI

---

1. Defendant Chas. F. Smith & Son, Inc. was a co-defendant but did not answer either complaint. The trial court certified this appeal under Rule 2–602(b)(1).

altered the natural channel and water course resulting in an increase in the current velocity of the stream by straightening its path and narrowing its banks, which over time accelerated erosion of the streambed, further increasing the depth. The parents in addition asserted that Smith and GCI constructed and repaired some storm water and sewer lines which emptied into Moore's Run, increasing the water volume and current velocity and further exacerbating erosion of the streambed. They concluded that Smith's and GCI's negligent actions, all under the supervision and control of the City and RKK,

"directly contributed to the creation of an artificial and unreasonably dangerous pocket of deep water in Moore's Run. Defendant[s] knew or should have known that by altering and changing the depth of the streambed [they] had created an artificial and unreasonably dangerous condition that could cause injury to unsuspecting children and other citizens who might attempt to cross or walk through Moore's Run in the vicinity of the gabions."

On February 8, 1984, Casper and Kirtscher left Kirtscher's home at 5:20 p.m. to walk Kirtscher's dog along Moore's Run near their homes. Children frequently play in and around Moore's Run and as the parents assert "[f]or years children and their families have used this public property as park land." On the evening of February 8, because of winter weather conditions, the area where the gabion construction had been completed nine years earlier was six to eight feet deep and covered with ice. Sometime after 6:00 p.m., the children were found in the area of the deep freezing water and it was estimated each child had remained submerged for at least 15 minutes until rescued by the Baltimore City Police Department. In addition to the injuries previously mentioned, each child is unable to speak and has an intelligence level comparable to a three-month-old infant. Consequently, neither child can explain how the accident occurred. The parents surmised that the accident occurred when the dog went onto the ice and fell

through and the children fell through while attempting to rescue the dog.

The parents filed suits asserting that Smith, GCI, RKK and the City breached their respective duties proximately causing injury to the children. The defendants filed pretrial motions[2] in which each argued:

1) It did not owe a duty of care to either child because (1) there was no contractual duty; (2) the children were trespassers or bare licensees at the time of the accident; and (3) water is an open and obvious danger;

2) Its conduct was not the proximate cause of the accident;

3) As a matter of law, the children were contributorily negligent and assumed the risk of their injuries.

The City also argued that it was immune from liability by virtue of municipal immunity. The court adopted the reasoning of the defendants and granted the respective motions. The court then dismissed the complaints without leave to amend, precipitating these two appeals.

Appellants present a number of issues for our consideration. Specifically, they assert:

I. "The trial court erred in ruling that the City was immune from suit, because it was not engaged in a proprietary function at the time its negligence caused the injuries to Casper and Kirtscher."

II. "The trial court erred in ruling that appellees did not owe a duty to Casper and Kirtscher, residents and citizens of Baltimore City, because they were trespassers or, at best, bare licensees while properly upon unmarked and unposted City property naturally used as park land by Casper and Kirtscher and their neighbors."

III. "The trial court erred in ruling that the conduct of RKK and GCI was not the proximate cause of Casper's and Kirtscher's injuries.

---

2. RKK filed motions to dismiss for failure to state a claim. GCI filed motions for summary judgment and the City filed motions to dismiss or in the alternative for summary judgment.

A.   "RKK and GCI's negligence was active and the proximate cause of the children's injuries.

B.   "Natural erosion was not an intervening cause.

C.   "RKK's and GCI's negligence was not too remote in time to be the proximate cause of the accident."

IV.   "The trial court committed reversible error:

A.   "Because it failed to apply the presumption that Casper and Kirtscher acted with due care and, therefore, erroneously concluded that their conduct barred them from recovery.

B.   "In failing to assess Casper's and Kirtscher's conduct by the standard of due care applicable to reasonably prudent seven and eight year old children.

C.   "By discarding the complaints' description of the hidden danger awaiting the infant plaintiffs and thereby failing to take as true the allegations of the complaints and all reasonable inferences drawn therefrom.

D.   "Because, accepting the children's allegations as true and presuming that they exercised such care as would a reasonably prudent child of like age and intelligence, the trial [court] could not conclude that Casper and Kirtscher were contributorily negligent as a matter of law when they confronted the concealed danger created by appellees at Moore's Run."

V.   "The trial court erred in ruling that Casper and Kirtscher assumed the risk of their injuries."

## I.   MUNICIPAL IMMUNITY

The motions to dismiss filed by the City were based on the conclusion that when the City contracted for work to be performed at Moore's Run in 1974, the City was engaged in a governmental as opposed to a proprietary function and thus the doctrine of municipal immunity bars appellants' recovery.

According to appellants, the work performed by the City was in the nature of sewer work and was not a governmental function and thus no immunity attaches to the City.

Appellee City naturally contested this conclusion and asserted that the complaint indicates that the alleged negligent gabion construction was for erosion purposes, a governmental function. The court ruled that the City enjoyed immunity because "Moore[']s Run, as it existed in 1984, was not a proprietary function of the City."

We need not decide the exact nature of the activity at Moore's Run in light of our ultimate holding. We thus assume for purposes of this opinion that the City does not enjoy municipal immunity from liability. This conclusion brings appellants only one step closer to recovery. We next examine whether any appellees, including the City, owed any duties to appellants.

## II. DUTIES OWED

Appellants next allege the court erred in ruling that appellees owed no duty to the youngsters because there was no contractual duty; they were trespassers or, at best, bare licensees in Moore's Run at the time of their injuries; and because water is an open and obvious danger.

It is essential to actionable negligence that there be a duty on the part of the defendant(s) to protect the plaintiff(s), failure to perform that duty, and consequential injury. *Mayor of Havre De Grace v. Fletcher*, 112 Md. 562, 567–68, 77 A. 114 (1910). Negligence may result from a violation of a duty to use the degree of care required under the particular circumstances. If no duty is owed, no action can be sustained, even though injury has occurred. *Bauman v. Woodfield*, 244 Md. 207, 216, 223 A.2d 364 (1966).

In their complaints, appellants alleged several duties appellees owed to the children and themselves. Specifically, they suggested appellee GCI had (1) a duty to perform the contract in a workmanlike and safe manner; (2) a duty to exercise due care; (3) a duty not to alter the natural condition of Moore's Run or its streambed; and (4) a duty not to create an "artificial and unreasonably dangerous condition" in Moore's Run, namely a deep pocket of water.

With respect to appellees RKK and the City, appellants alleged they each owed the duty to properly supervise the construction and to properly design or correct any faulty design of the project, in particular, the gabions. Appellants posited that the collective breach of these various duties "directly contributed to the creation of an artificial and unreasonable condition in Moore's Run." Since appellants presented three possible legal positions occupied by appellees, we consider the possible duties owed under these three positions.

—Contractual Duty—

Appellants first alleged appellee GCI owed a duty sounding in contract to perform the contract in a safe and workmanlike manner. On appeal, they now assert a contractual duty on the part of the other appellees not to alter the streambed. We consider the duties owed as if they had originally alleged these duties from the beginning.

Appellants cite to *Council of Co-Owners Atlantis Condominium, Inc. v. Whiting-Turner Contracting Co.*, 308 Md. 18, 32, 517 A.2d 336 (1986), to support their theory that appellees' failure to perform the contract properly is an actionable tort despite the fact that appellants are not in privity to the contract between appellee City and the other appellees. While privity is no longer required in this situation under *Atlantis Condominium,* the Court of Appeals still ruled that "[w]hile a contract may serve to define the nature of the obligation undertaken, and thus serve to identify the allocation or assumption of duties among various parties, it will not create a legal duty where one does not exist." 308 Md. at 32, 517 A.2d 336.[3] Thus, we turn to examine what, if any, legal duties appellees GCI, RKK and the City owed to appellants.

---

3. In fairness to the trial judge, we note that *Atlantis Condominium* was decided after the date of the trial court's decision in this case. Hence, the trial court did not rely on *Atlantis Condominium* when ruling on the motions.

—Project Capacity Duty—

Appellants asserted appellees, in their various project capacities in 1974, owed legal duties to protect the youngsters from harm. Appellants specifically alleged appellee GCI, as subcontractor, owed a duty not to deepen and alter the natural streambed of Moore's Run to create an unreasonably dangerous condition. They similarly alleged appellee RKK and the City, as project supervisors, owed a duty to supervise properly and inspect the project so as not to deepen and alter Moore's Run to create an unreasonably dangerous condition. Likewise, they asserted appellee RKK and the City, as project designers and design consultants, had a duty not to design an unreasonably dangerous condition and to correct any design defects that created an unreasonably dangerous condition.

■ The duties owed by project designers, supervisors and builders to third parties pursuant to work performed under a contract was recently set forth in *Atlantis Condominium*. Judge McAuliffe, writing for the Court of Appeals, held that "the duty of builders and [designers] [is] to use due care in the design, inspection, and construction of a [project] [and this duty] extends to those persons foreseeably subjected to the risk of personal injury because of a latent and unreasonably dangerous condition resulting from that negligence." *Atlantis Condominium*, 308 Md. at 22, 517 A.2d 336. From the complaints, appellants clearly alleged existent duties on the parts of appellees GCI, RKK and the City, stemming from their respective roles in construction of the project.

—Landowner's and Agents' Duty—

Appellants also asserted appellee City was and is the owner of Moore's Run. They did not assert in their pleadings that as landowner appellee City owed a duty to the youngsters, but it is clear from the various motions filed and the court's ruling that the status of the City as landowner presented a separate duty owed to appellants apart

from its position as project designer and supervisor. The court ruled that, because the youngsters were trespassers or at best bare licensees, the City as landowner and the subcontractor and engineer, as agents of the landowner, owed no duty to the two children.

■ There is no doubt that "[t]he nature and extent of a tort duty ... depends in part on the status of the party upon whom it is sought to be imposed, and upon [the] relationship to the party claiming the benefit of it." *Atlantis Condominium*, 308 Md. at 36, 517 A.2d 336. As the owner of land, a person or entity owes a duty to those who may come upon it. As agents of the landowner, contractors owe the same duty to those who come upon the realty. *See Kirby v. Hylton*, 51 Md.App. 365, 371, 433 A.2d 640 (1982). The extent of that duty is fixed by the status—invitee, licensee, trespasser—of the person claiming it. *Rowley v. Mayor of Baltimore*, 305 Md. 456, 464–65, 505 A.2d 494 (1986). An invitee is one invited or permitted to enter another's property for purposes related to the landowner's business. A licensee is one who enters property with the knowledge and consent of the owner but for his or her own purposes. *Bramble v. Thompson*, 264 Md. 518, 521, 287 A.2d 265 (1972). There are two types of licensees: a bare licensee and a licensee by invitation, known as a social guest. *Bramble*, 264 Md. at 521, 287 A.2d 265. A trespasser is one who intentionally and without consent or privilege enters another's property. *Bramble*, 264 Md. at 522, 287 A.2d 265.

■ Toward an invitee, the owner of the property "must use reasonable and ordinary care to keep [the] premises safe ... and to protect the invitee from injury caused by an unreasonable risk which the invitee, by exercising ordinary care ... will not discover." *Bramble*, 264 Md. at 521, 287 A.2d 265. With respect to a licensee by invitation, an owner need only provide that degree of care which the host provides for his or her own family. *Bramble*, 264 Md. at 521, 287 A.2d 265. A trespasser and a bare licensee are

owed the same degree of care by the owner—that is, those with this status, even if of tender years, take the property as they find it and are owed no duty by the owner except that the owner may not wilfully or wantonly injure or entrap once the licensee's or trespasser's presence is known. *Bramble*, 264 Md. at 521, 287 A.2d 265.

As we stated, the court ruled the youngsters were trespassers or bare licensees. Appellants posit that since Moore's Run has unrestricted access, since appellee City is not a private landowner but a public landowner, and since the youngsters are members of the public and thus, in essence, owners of Moore's Run, they could not be trespassers or even licensees.[4]

We have not uncovered and appellants have not cited any Maryland case which addressed the specific issue of the status of a plaintiff upon unrestricted public property.[5] We need not decide this issue, however. Even if we hold that the children enjoyed the highest status, that of invitees, as we will explain *infra*, the City and its agents did not fail to keep the premises safe and free from an unreasonable and latent danger.

Now that we have set out the various duties owed by appellees in their respective capacities, we resolve whether, as a matter of law, appellees breached their respective duties.

---

**4.** Appellants do not assign a status to the two youngsters. If we follow their theory to its natural conclusion, however, the girls breached the exact duty appellants are claiming appellees breached. If the youngsters are, in essence, owners of Moore's Run, and as appellants alleged Moore's Run presented an unreasonable and latent dangerous condition, then they, as owners, breached the duty of a landowner to keep the premises safe from unreasonable risk.

**5.** In *Fopma v. Board of County Comm'rs of Prince George's County*, 254 Md. 232, 234–35, 254 A.2d 351 (1969), the Court of Appeals ruled that a boy who traveled off the public right-of-way into *restricted*, fenced-off public property was a trespasser. *See also Birckhead v. Mayor of Baltimore*, 174 Md. 32, 38, 197 A. 615 (1938).

### III. BREACH OF DUTIES OF CARE

Appellants' complaints are based on the theory that the subcontractor, project supervisors, designers, and owners or owners' agents breached their duties to protect the young girls when they designed, constructed and maintained a deep pocket of water in a natural stream. Thus, the question before us is simply reduced to the following:

Is this artificially created deep area in this natural body of water an unreasonably and latent dangerous condition?

We must answer this question in the negative.

#### —Unreasonable Danger—

■ The trial court ruled that "water has long been held by courts everywhere as to contain its own warning of possible danger." In *Honolulu Ltd. v. Cain,* 244 Md. 590, 599, 224 A.2d 433 (1966), the Court of Appeals stated:

"Where a dangerous condition is obvious, the plaintiff may be charged with knowledge of it, and the knowledge of the condition may remove the element of unreasonableness from a danger."

We hold that the danger inherent in this open and obvious body of water was discoverable by these children. Thus, by definition, this body of water, both deep and shallow, was not an unreasonably dangerous condition.

In *State ex rel. Alston v. Baltimore Fidelity Warehouse Co.,* 176 Md. 341, 4 A.2d 739 (1939), the parents of a deceased 11–year-old child brought a negligence suit against the owner of a raft when the child fell off the raft and drowned. The raft was moored in waters at the end of a street where children were known to frequent. The street came to an end at the water and a stone wall was built across its width. The Court ruled that "the presence of the raft [did not] add to the *natural danger of the open water* at the end of Battery Avenue." *Alston,* 176 Md. at 346, 4 A.2d 739 (emphasis supplied). Similarly, in *Mayor of Baltimore v. State ex rel. Ahrens,* 168 Md. 619, 179 A. 169 (1935), the Court of Appeals held that the City of Baltimore was immune from liability when a 10–year-old boy drowned

in Gwynns Falls. The testimony demonstrated that Gwynns Falls was a narrow stream, generally shallow until it suddenly reached a depth from 15 to 20 feet. The boy was wading in the shallow end and somehow went into the deep water and drowned. Although the issue addressed by the Court was whether the maintenance of Gwynns Falls Park was a governmental function, the Court quoted extensively from the case of *McGraw v. District of Columbia*, 3 App.D.C. 405, 409 (1894), and in so doing discussed the inherent danger of water:

> " 'Land covered by water is necessarily more or less beyond the ordinary control of man; and the margins of streams, rivers and lakes, as well as of the ocean, are subject to a power which the ordinary operations of man may neither determine nor direct. To hold that the margin of a great river, with the mighty volume of water that constantly comes down to disturb its configuration, should be kept level and smooth, free from holes and depressions, and equally safe for the use of adult man and the child of tender years, would be to demand the impossible. It is common experience that the bed of a river is in course of constant change; and that in places the sand and earth are accumulated, in other places excavated or depressed and holes and ravines formed even in a single night.' "

*Ahrens*, 168 Md. at 627, 179 A. 169.

■ Appellants take the position that sharp drops or deep holes artificially created in a natural stream constitute an unreasonable danger. Although appellants urge this Court to distinguish between natural water and artificially-deepened water, on the facts of this case we decline to do so. There were no allegations in the complaints that Moore's Run was anything other than a natural body of water that was deepened in a certain area by man-made excavation and further deepened by natural erosion. Hundreds of bodies of water, large and small, natural and artificial, dot the State of Maryland. They take their toll of human life. All bodies of water deep enough to drown a child and situated

within roving distance of children, present a danger from which an injury or death to some child may reasonably be anticipated. But it does not automatically follow from such a fact that due care is not exercised when a person or entity takes a body of water and alters it, either to make it wider, narrower, longer, shorter, shallower or deeper than its present state. Conditions such as sharp drops or deep holes are also found in natural ponds, pools, lakes, streams, rivers, and other bodies of water. They are common to nature and are not foreign to any body of water. We hold that, if a landowner and its agents, such as contractors, subcontractors, designers, engineers and/or consultants, create an artificial condition in a body of water, without adding any further danger, no unreasonable danger is designed, constructed, or maintained.

—Latent Danger—

Appellants attempt to challenge the open and obviousness of Moore's Run by asserting that the depth of the stream was concealed by a layer of ice and twilight, and thus it became a latent danger—"an artificial deathtrap." In support of their argument, they cite us to several Maryland and foreign cases. We find these cases distinguishable.

In *Stein v. Overlook Joint Venture*, 246 Md. 75, 227 A.2d 226 (1967), the Court of Appeals reversed a directed verdict in favor of the association owners of an apartment building. An eight-year-old child visiting the building for the first time was injured when she walked into a pane of glass that was not marked or affixed with decals. The maintenance engineer testified that there were six or seven other similar accidents that had been previously reported; he and the resident manager had discussed the "existing dangerous conditions"; and originally all panels had decals but when they were replaced, no decals were affixed to the replaced panels. *Stein*, 246 Md. at 79, 227 A.2d 226. The Court reasoned that a directed verdict was improper because the defendant had knowledge of the dangerous characteristics of clear glass, there was evidence of prior accidents, and

there was evidence of the failure to replace decals. *Stein,* 246 Md. at 81, 227 A.2d 226.

In distinguishing *Stein,* we recognize that clear glass, unlike a body of frozen water, is not readily apparent. It is the exact property of transparency that makes the use of glass so commonplace. A body of water, on the other hand, is, by its size, color, opaqueness and current, obvious. An ice-covered body of water is no less obvious. Moreover, unlike *Stein,* there was no evidence in the case *sub judice* of prior accidents in Moore's Run in the gabion area, nor any express statements by any appellees of the latent danger presented by the deep water pocket. *Stein* simply is of no assistance to appellants in advancing their argument that Moore's Run was a latent trap.

In *Reiser v. Abramson,* 264 Md. 372, 286 A.2d 91 (1972), also cited by appellants, the Court of Appeals approved the reservation as a jury question the issue of the plaintiff's contributory negligence when she fell as a result of slipping on a patch of water in the defendant's laundry room. The Court reasoned:

> "Water is a colorless liquid. The testimony here is that that which was on the floor was in fact colorless.... [I]t often is not visible to the naked eye. Its visibility depends upon the angle at which it is viewed and the direction from which light comes."

*Reiser,* 264 Md. at 378, 286 A.2d 91. The distinction between a patch of water on a floor and a partially frozen body of water in the open is too evident to elucidate. Accordingly, *Reiser* does not persuade us that the danger in Moore's Run was latent.

Appellants also cite *Honolulu Ltd.,* with facts similar to *Reiser,* to suggest that a concealed danger raises a jury question about primary negligence. In that case, the plaintiff was injured when she slipped and fell on a thin patch of ice which had formed on the black macadam surface of the defendant's parking lot. The defendant argued that the ice was an "obvious danger." *Honolulu Ltd.,* 244 Md. at 599,

224 A.2d 433. The Court ruled that the plaintiff was not contributorily negligent as a matter of law. In discussing the danger, the Court of Appeals noted that the patch of ice had formed after the plaintiff walked through the parking lot to a store but before she had returned to her car. *Honolulu Ltd.*, 244 Md. at 599–600, 224 A.2d 433. A partially frozen body of water is completely distinguishable from a recently formed patch of ice.

Appellants also refer us to three Illinois cases in their efforts to establish that an ice-covered stream is a latent unreasonable danger. We find those cases of no assistance to appellants.

In *Weber v. Village of Carol Stream*, 129 Ill.App.3d 628, 84 Ill.Dec. 807, 472 N.E.2d 1203 (1984), a nine-year-old boy, who fell through an ice-covered water retention pond in a residential subdivision, was barred from recovery because the frozen pond presented, as a matter of law, an open and obvious danger. The Illinois Appellate Court expressly recognized:

"Like the danger of water, an ice-covered pond is such a danger which, under ordinary conditions, may reasonably be expected to be fully understood and appreciated by children of an age to be allowed at large. Children are expected to appreciate the possible hazards associated with water and should know that the same dangers accompany ice, which is the frozen form of water. An ice-covered pond presents an obvious risk of drowning which we believe children would be expected to appreciate and avoid."

*Weber*, 84 Ill.Dec. at 810, 472 N.E.2d at 1206. Appellants attempt to distinguish *Weber* by asserting that the artifi-cially-created, ice-covered pocket of water in Moore's Run veiled by twilight took this case out of the realm of "ordi-nary conditions" mentioned by the Illinois Court. We sim-ply do not agree. Twilight is a common, ordinary natural phenomena which does not prevent the ordinary person from observing his or her surroundings. And, as we stated, we decline in this case to exempt Moore's Run from the

category of an open and obvious danger simply because its streambed was artificially, as opposed to naturally, altered, particularly where the interference occurred long before the incident.

In *Pasierb v. Hanover Park Park District*, 103 Ill.App.3d 806, 59 Ill.Dec. 461, 431 N.E.2d 1218 (1981), the Illinois Court held that a creek concealed by ice and snow did not constitute a danger which a seven-year-old drowning victim could be expected to observe. Appellants seize upon the Court's reasoning that "an instrumentality, although not in itself dangerous, may become dangerous when joined with other non-dangerous instrumentalities or surroundings." *Pasierb*, 59 Ill.Dec. at 463, 431 N.E.2d at 1220. The Court, however, went on to rule:

> "In the present case ... [p]laintiff charged that a creek in the park, frozen over with a thin layer of ice, was completely concealed by a layer of snow which made it impossible to discern the location of the creek. We believe the risks involved in a completely concealed creek in a park are not the type 'which children generally would be expected to recognize and appreciate.'"

*Pasierb*, 59 Ill.Dec. at 462, 431 N.E.2d at 1219, quoting *Corcoran v. Village of Libertyville*, 73 Ill.2d 316, 22 Ill. Dec. 701, 705, 383 N.E.2d 177, 181 (1978). An important factual distinction separates *Pasierb* from the case *sub judice:* the creek and the surrounding land were covered by snow, making it virtually impossible to distinguish where the land ended and the water began. In contrast, there was nothing to hide the open and obvious danger of a frozen stream in the instant case. *Pasierb* is simply inapplicable.

The final case cited by appellants is similarly of little value in persuading us to adopt their position that Moore's Run was a latent danger. In *Corcoran*, the parents of a two-year-old child sued the village, township, and county after the boy fell into a ditch and hit his head suffering severe brain damage. As appellants point out, the Court did rule that

"[o]rdinarily, a ditch, in and of itself, does not pose a danger or hazard. Under certain circumstances, the condition of a ditch in its surroundings may enhance the risks of injury to unsuspecting children and, in fact, be a danger to children. A ditch may pose such a danger because of its depth or because it is hidden from view or for other reasons."

*Corcoran,* 22 Ill.Dec. at 705, 383 N.E.2d at 181. The Court, however, in affirming the ruling that the plaintiffs failed to state a cause of action, went on to hold:

"In their complaints, plaintiffs characterize the ditch in question as having 'a deceptively steep, unguarded and dangerous slope, which was eroded and caved in; an irregular embankment littered with debris and rubbish; *an unnaturally pocketed bed, which unnaturally caused water to accumulate in the ditch at various depths;* and an unreasonable and excessive accumulation of rubbish and debris in the ditch itself and about the approaches thereto.' ... It is apparent that, in spite of plaintiffs' attempts to characterize the ditch as one with particularly hazardous attributes, the pleadings, stripped of their conclusional emphasis, allege nothing more than the risk of falling into a ditch, a risk which is incident to any common ditch or obvious depression in the ground and one which children generally would be expected to recognize and appreciate." (Emphasis supplied.)

*Corcoran,* 22 Ill.Dec. at 705, 383 N.E.2d at 181. Even under the rationale of *Corcoran,* Moore's Run would not be a latent, unreasonable danger. Moreover, the *Corcoran* Court recognized the viability of the attractive nuisance doctrine, a doctrine long rejected in Maryland.

"A trap has been defined as a danger which a person who does not know the premises could not avoid by reasonable care and skill, a hidden danger lurking on the premises which may be avoided if known.... [A]n obvious danger is not a trap." 65 C.J.S. *Negligence* § 63(39) (footnotes omitted). In *Atlantis Condominium,* 308 Md. at 32, 517 A.2d 336, the Court of Appeals did not define the term, "latent"

danger, but described utility shafts having a deficient fire resistance rating as a latent danger for which the builder and architect could be liable. Moore's Run, in contrast, was open, apparent and expectable to these youngsters had they used their senses of observation.

By appellants' own allegations in their complaints, the stream was frozen over only in the gabion area and its presence was not concealed from its surroundings by underbrush, snow or even complete darkness. Moreover, the stream's presence was not abnormal, but something that might be expected to exist in land anywhere. There was simply nothing that obscured the fact that Moore's Run, as a matter of law, signaled its own lethal danger. *See also Cope v. Doe*, 102 Ill.2d 278, 80 Ill.Dec. 40, 464 N.E.2d 1023 (1984) (wrongful death action against owner who built and developed apartment complex containing water retention pond partially covered with ice not sustainable because water hazard to seven-year-old drowning victim was open and obvious); *Locke v. Liquid Air Corp.*, 725 F.2d 1331 (11th Cir.1984) (eight-feet-deep murky pond with sludgy, cement-like bottom is an obvious and patent danger reasonably appreciated by a child of sufficient maturity to be allowed abroad without supervision); *Waters v. United States Fidelity & Guar. Co.*, 124 Wis.2d 275, 369 N.W.2d 755 (1985) (landowner had no duty to remedy open and obvious danger of ten-feet-deep pond created by melting snow).

In conclusion, appellees, in their respective legal capacities, breached no duties of care when they altered the streambed in Moore's Run. Moore's Run, naturally and artificially deep, in both its frozen and flowing state, was a patent hazard which carried its own warnings of danger. It was not, without something more, an unreasonably latent dangerous condition. Since appellees, as a matter of law, did not breach any duties of care, the court properly granted the motions to dismiss and for summary judgment.

The question remains whether appellants can amend their complaints in any way to plead a sustainable cause of action. We conclude that they cannot. Let us explain.

## IV. DUTY TO WARN

At oral argument before this Court, appellants proposed an alternative theory for recovery. They suggested appellee City owed a duty to post a sign warning of the depth change in the gabion area and appellees GCI and RKK breached the duties to instruct the City to post a sign about the deep pocket of water.[6] Appellants did not assert this theory for recovery at the trial court level. Normally, we would invoke Rule 1085 to preclude consideration of the issue. In the interests of justice, however, and in view of the potential for pleading amendment under Rule 1071 a, we will reach the merits of this issue as if appellants had previously raised it.

In support of their argument that appellees owed duties to post a warning, appellants cite us to the Maryland Reports "headnote" for the case of *Ahrens,* 168 Md. at 619, 179 A. 169, wherein it provides:

"The City of Baltimore was not liable by reason of the drowning of a boy while wading in a stream in Gwynn's Falls Park, *even though the city was negligent in failing to warn the public by signs of the dangerous character of the spot at which the drowning occurred,* or to take other precautions to protect the public, since the maintenance and operation of the park was a governmental duty, performed by the city in its political and governmental capacity as an agency of the State." (Emphasis supplied.)

Although the headnote suggests Baltimore City was negligent in failing to post warnings, the Court, in the text of

---

6. Indeed, counsel for appellants conceded at oral argument that had a sign been posted, they would not have brought suit.

the opinion itself, relieves the City of any obligation to post: [7]

> " 'It cannot be that there is any duty imposed upon the municipality that charges it with knowledge of these mutations [changes in depth of water] and requires it to warn the public against them. Neither do we understand that, in the establishment of a free bathing beach, there is any duty imposed upon it to mark in any way the depth or relative depth of the water, so as to guard the ignorant bather from venturing too far. This is a case in which the bather must rely upon his own senses and his own caution; and he has no right to have the municipal authority substituted for the exercise of his own judgment.' "

*Ahrens,* 168 Md. at 627, 179 A. 169, quoting *McGraw,* 3 App.D.C. at 409. Where there is no duty on the part of the principal, the failure of the agent to advise the principal to perform that duty could not be the proximate cause of any injury. Accordingly, if appellee City in the case *sub judice* had no duty to post a sign about depth, there could be no duty on the part of appellees GCI and RKK to instruct the City to post a sign. There is simply no way appellants can recover under the theory of a failure to post a sign.

This conclusion is not to be interpreted so as to suggest that a warning of a sudden change in depth or an alteration of a body of water is never required. In *Myszkiewicz v. Lord Baltimore Filling Stations, Inc.,* 168 Md. 642, 648, 178 A. 856 (1935), the Court of Appeals ruled that "[t]he tolerated intruder must take the premises as he has found them, and can only demand notice of any new and abnormal condition which increases the danger of the condition which the licensee has been permitted by the licensor to regard as naturally attaching to his habitual user." Similarly, in

---

**7.** Counsel know that headnotes have no authority or precedential value and, in fact, the headnotes for the same case reported in the Atlantic Reporter are not only different, but correctly state the rulings of the Court.

*Hensley v. Henkels & McCoy, Inc.*, 258 Md. 397, 401–11, 265 A.2d 897 (1970), the Court of Appeals reviewed numerous cases considering the issue of the duty to warn or give notice about new and sudden changes. In citing several of these cases, the Court noted that the amount of time that had passed since the condition was created might, in and of itself, serve as ample warning that the status quo of the land had been altered. *Hensley*, 258 Md. at 405–06, 265 A.2d 897. In this case, the condition complained of had been in existence over nine years and, in fact, the alteration occurred prior to the youngsters' respective births. There was nothing covert, new or sudden about the alteration in Moore's Run, and as appellants' asserted, natural erosion further altered the streambed. Thus, in this case, there was no duty owed by any appellee to warn anyone venturing near or in the stream.

Even if appellants were permitted to amend their pleadings and could propose other duties owed and breaches of those duties which proximately caused the youngsters' injuries, we are still left with the inescapable conclusion that recovery would be barred as a matter of law. As is clear from the complaints, the youngsters assumed the risk of their actions.

## V.  ASSUMPTION OF RISK

The trial court found as a matter of law that the two youngsters were guilty of contributory negligence and assumed the risk of their actions. The court's rationale was that

"water has long been held by courts everywhere as to contain its own warning of possible danger. The Plaintiffs knew or should have known that frozen streams present a dangerous condition, and that walking out on the ice under the circumstances and conditions which existed at the time complained of consisted of a perilous and dangerous act which might result in harm, and that by doing so, the Plaintiffs assumed the risk."

In light of our previous discussion about the obvious peril of Moore's Run, we agree with the trial court that these children assumed the risk of this tragedy.

Appellants first contend that the girls cannot be found to have assumed the risk or been contributorily negligent because their inability to testify creates a presumption that they exercised ordinary care for their own safety. Appellants then argue that the court erred in failing to apply the presumption.

The presumption to which appellants refer is a presumption that a plaintiff unable to testify, because of death or a mental condition resulting from injuries suffered, exercised ordinary care for his or her own safety. *Nizer v. Phelps*, 252 Md. 185, 205, 249 A.2d 112 (1969). There is no doubt but that the presumption applies to the question of the contributory negligence of a plaintiff unable to testify. *Nizer*, 252 Md. at 205, 249 A.2d 112; *Todd v. Weikle*, 36 Md.App. 663, 676–78, 376 A.2d 104 (1977). The issue of whether the presumption similarly applies to the claim of assumption of risk has never squarely been considered in this State.

In *Bratton v. Smith*, 256 Md. 695, 704, 261 A.2d 777 (1970), the Court of Appeals suggested the presumption might apply to this defense but declined specifically to rule so. In that case, a plaintiff was killed when he fell off the wagon hitch of a tractor and was run over by the trailer being pulled by the tractor. The plaintiff had been standing on the hitch and was dislodged at some point when the tractor swerved off the road. The relevant issue before the Court was whether the trial court erred in refusing to instruct the jury on the presumption of the deceased's due care. After reviewing the case law concerning the existence of the presumption and the facts of the particular case, the Court stated that "in the instant case the questions of contributory negligence and the assumption of risk, insofar as the deceased is concerned, are closely parallel." *Bratton*, 256 Md. at 704, 261 A.2d 777. The Court then ruled that the deceased's actions, "no matter how we may charac-

terize them," did not entitle the plaintiff to the due care instruction. *Bratton,* 256 Md. at 704, 261 A.2d 777. Although this quoted language suggested that the presumption may be applicable when assumption of the risk is at issue, the Court then suggested that the trial court would have been proper in directing a verdict for the defendant tractor driver on the basis of contributory negligence. *Bratton,* 256 Md. at 705, 261 A.2d 777. The Court was simply silent on the issue of assumption of risk.

In *Young v. Dietzel,* 13 Md.App. 159, 282 A.2d 150 (1971), Judge Moylan, speaking for our Court, addressed the question of the application of the presumption to a deceased defendant. We rejected its application and through Judge Moylan plainly stated that the presumption has no relevance to primary negligence but "is highly relevant to the issue of contributory negligence...." *Young,* 13 Md.App. at 165–66, 282 A.2d 150. The question of its application to the defense of assumption of risk was not addressed. Although we discussed the presumption of due care in great detail, and could well have discussed its application to a charge of assumption of risk, we chose not to do so.

■ Our examination of the distinctions between contributory negligence and assumption of the risk convinces us that the presumption at issue is not applicable to a claim that the plaintiff assumed the risk of injury. "Contributory negligence is the neglect of the duty imposed upon all ... to observe ordinary care for their own safety." *Campfield v. Crowther,* 252 Md. 88, 93, 249 A.2d 168 (1969). Assumption of risk "implies an intentional exposure to a known danger." *Sacks v. Pleasant,* 253 Md. 40, 46, 251 A.2d 858 (1969).

" 'The defense of assumption of risk rests upon the plaintiff's consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of harm from a particular risk. Such consent may be found:
* * * by implication from the conduct of the parties.

When the plaintiff enters voluntarily into a relation or situation involving obvious danger, he may be taken to assume the risk, and to relieve the defendant of responsibility. Such implied assumption of risk requires knowledge and appreciation of the risk, and a voluntary choice to encounter it.' "

*Gibson v. Beaver & Southern States Howard County Petroleum Coop., Inc.,* 245 Md. 418, 421, 226 A.2d 273 (1967), quoting Prosser, *Torts* § 55 (2d ed. 1955). "[I]n some cases, the same facts may support a contention of contributory negligence and of assumption of the risk." *Sacks,* 253 Md. at 46, 251 A.2d 858. While the two questions may not overlap in all cases, the practical effect of the application of either is the same—recovery by the plaintiff is barred.

Even though the end result of a finding of contributory negligence and assumption of the risk is the same, the rationale for the result differs:

"Contributory negligence defeats recovery because it is a proximate cause of the accident which happens, but assumption of the risk defeats recovery because it is a previous abandonment of the right to complain if an accident occurs."

*Baltimore Transit Co. v. Sun Cab Co.,* 210 Md. 555, 562–63, 124 A.2d 567 (1956). If assumption of the risk bars recovery because it is a prior abandonment, then, regardless of the amount of care exercised by a plaintiff, assumption of the risk can and does defeat recovery. Hence, the presumption of the quantum of care exercised by the plaintiff is simply immaterial to a charge that the plaintiff assumed the risk.

Applying this reasoning to the case *sub judice,* even if we were to rule that the trial court erred in failing to apply the presumption of due care to the question of the youngsters' alleged contributory negligence, there would be no error if the court were correct in finding the children assumed the

risk of their actions as a matter of law. We turn to a consideration of that question.

As we stated, when a plaintiff voluntarily enters into a situation involving obvious danger, he or she may be found to have assumed the risk. There is no doubt that a child of tender years can assume the risk of his or her actions. *E.g.*, *Kirby*, 51 Md.App. at 371, 443 A.2d 640. "In determining whether a plaintiff had knowledge and appreciation of the risk, an objective standard must be applied and a plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him." *Gibson*, 245 Md. at 421, 226 A.2d 273. As in the case of contributory negligence, whether the plaintiff assumed the risk is generally a question for the trier of fact. *E.g.*, *Baltimore County v. State ex rel. Keenan*, 232 Md. 350, 362–66, 193 A.2d 30 (1963). When, however, the facts permit only one conclusion, assumption of risk may be found as a matter of law. *E.g.*, *Gibson*, 245 Md. at 422, 226 A.2d 273.

■ In the case *sub judice*, as we have previously pointed out, Moore's Run signaled its own lethal danger to the two children. Whatever hazard and whatever danger, it was open and obvious. By appellants' own allegations, the stream's shallow depth was readily apparent in all areas except the frozen gabion area. It is because of the very fact that the gabion area was frozen over, and thus its depth unknown, that the youngsters should have been alerted to danger. Further, appellants conceded in their complaints that "children frequently cross over Moore's Run at various points where the water level is low, and well worn paths into Moore's Run are clearly evident[,]" indicating children are aware of the deep water gabion area and avoid it. Additionally, appellants never alleged that the girls were of a subnormal mental or physical state which affected their ability to perceive and appreciate the danger of venturing near or onto an ice-covered body of water. Rather, the fact that these youngsters were at large without

supervision suggests that their own parents believed the youngsters could comprehend and appreciate danger and avoid it, or at least make an intelligent and responsible choice when faced with a dangerous situation. This may be borne out by the fact that the girls attempted to rescue the dog suggesting they knew the dog was in danger when it traveled onto the ice. Finally, there was no allegation that this was the first time the youngsters had ever encountered Moore's Run and we can only infer, since we have not been told otherwise, that they have observed Moore's Run previous times in the past.

Even if we could say that the children did not know nor should they have known that an ice-covered stream per se was dangerous and perilous, our conclusion would remain unchanged. According to appellants' version of this tragedy, the girls attempted to rescue the dog after it fell into the water. At the moment the ice broke from the weight of the dog, the girls should have been alerted that Moore's Run was a hazard to be avoided.

At whichever point we attribute knowledge to the children—before or after the dog fell in—the only conclusion we can reach is that they knew or should have known of the open and obvious danger of Moore's Run and, hence, assumed the risk of their actions.

> " 'A risk, while obvious, may not be so imminently dangerous that a prudent man would necessarily avoid it, yet if it shall be freely encountered it will in general be held to be so far assumed that no recovery for consequent injury is possible.' "

*Pinehurst Co. v. Phelps,* 163 Md. 68, 72, 160 A. 736 (1932), quoting *Bohlen's Studies in Torts,* 446. We hold that venturing onto, or at the banks of, or so close to as to present a possibility of falling into, an ice-covered or ordinary body of water without an awareness of its depth, or with such an awareness, constituted assumption of the risk as a matter of law in the case *sub judice.*

Appellants cannot escape this conclusion by propounding that there is no evidence the youngsters walked onto the ice. In their reply brief, appellants suggest that the children could not have assumed the risk because no one knows whether they voluntarily encountered the risk:

"The Complaints do not allege that the children walked onto the ice. It is alleged that the children 'attempted to rescue the dog, and fell through the ice into' Moore's Run. At which site this happened is not known.[8] Nor is it known how it happened."

While no one will ever know how the accident happened, there is no evidence or even suggestion that they arrived in the water in any other way except by their own actions. *See Medina v. Meilhammer*, 62 Md.App. 239, 248, 489 A.2d 35, *cert. denied*, 303 Md. 683, 496 A.2d 683 (1985). If they jumped, ran, walked, or crawled onto the ice or even if they leaned over too far into the water from the bank, through their own volition they positioned themselves hazardously close to the open and obvious danger.

We are acutely aware of the tremendous emotional, physical and economic burdens placed on the two families in this case as a result of this accident. The need to find a means to ease those burdens does not, however, justify straining the principles of negligence to achieve a more palatable result. The injury of a child stirs the sympathetic concerns of all. As the Court of Appeals has sadly recognized, "[a]dventurous youth always has, and ever will, furnish its full death and accident toll." *Ahrens*, 168 Md. at 628, 179 A. 169. As lamentable as that is, upon the complaints and inferences deducible therefrom, this tragedy cannot be attributed to actionable negligence on the part of appellees.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.

---

8. We assume appellants maintain that the site of the accident was somewhere in the gabion area or their negligence claim would lose all viability.