471 A.2d 768

BALTIMORE GAS & ELECTRIC COMPANY

v.

Robert E. THOMPSON, et ux.

No. 732, Sept. Term, 1983.

Court of Special Appeals of Maryland.

Feb. 15, 1984.

James H. Cook, Towson, with whom were Robert A. Amos and James A. Biddison, Jr., Baltimore, on brief, for appellant.

James M. Gabler, Baltimore, with whom were John J. Boyd, Jr., Smith, Somerville & Case, Gerald H. Cooper, Barbara J. Wagar and Cooper, Beckman & Tuerk, Baltimore, on brief, for appellees.

Argued before MOYLAN, LOWE and GETTY, JJ.

LOWE, Judge.

Although Robert E. Thompson was hired by Insul-Temp/Airco, Inc. (Insul-Temp) as a pipe insulator, his employment was, for purposes of this case, at the Baltimore Gas and Electric Company's (B.G. & E.) Gould Street Power Plant. His work assignments came from or through B.G. & E.'s foremen and supervisors for fifteen months, from the time he was employed until the time he was injured, although his skills and performances were subject to his employer's supervision.

Thompson had his own portable metal scaffolding which he used occasionally. It contained a built-in ladder at the top of which was an access opening through protective siderails. Scaffolding was frequently necessary to reach and insulate the large overhead pipes.

In August of 1979, a leak developed in an overhead steam pipe which required a scaffolding platform 10 feet above ground level to provide access for the pipe to be stripped, repaired (welded) and reinsulated. A substantial wooden scaffolding 4½ feet wide and 6 feet deep was built by B.G. & E. using 4″ × 4″ beam supports, 2″ × 12″ lumber for the flooring and two 2″ × 4″ guardrails, the top rail 38½ inches and the other rail approximately 20 inches above the flooring; however, no access opening was provided through the railings. Furthermore, a 1″ × 10″ "toe board" was installed along the flooring inside the 4″ beams in order to keep tools and materials from falling.

To reach the scaffolding from ground level, employees of both B.G. & E. and Insul-Temp commandeered a ladder from elsewhere in the plant and ascended it to the railings which they climbed in one of two ways. If a 16 foot ladder was available as described by a B.G. & E. foreman, he would ascend it to the top, sit on the top railing, swing his legs over the railing and drop the 38½″ to the platform. When only a 12 foot ladder was available as on the day when appellee was injured, the appellee following the customary manner of ascent of others with whom he worked (regardless of em-

ployer), upon reaching the top of the ladder, took hold of the top guardrail and stepped on the toe board to gain sufficient elevation to step over the top rail.

Although on cross-examination appellee acknowledged that "toe boards" were intended to keep materials from falling and not as a "bearing surface" because they could break, he had always stepped on the toe board at this location since there was no other means of access from a 12 foot ladder. He "thought it [the toe board] was there to climb over, to use to get over the top of the rail. Like it was, everybody else did." Furthermore, he thought it was safe to do so, not only because he had done so before, but because he had seen others—including B.G. & E. employees—do so.

On the fateful day in August, 1979, the "toe board" broke under appellee's weight as he prepared to step over the top rail. He fell to the floor, was seriously and permanently injured, sued B.G. & E. in the Circuit Court for Baltimore City and was awarded $1,300,000 by a jury.

Upon appeal, B.G. & E. does not contest the amount of damages but primarily rests its hopes upon its conclusion that appellee had assumed the risk or negligently contributed to his own injury by the manner he utilized in attempting to enter the scaffolding. With less intensity, but equal hope, B.G. & E. also contends that because Thompson was not an employee of B.G. & E., error was committed by the trial judge having instructed the jury that B.G. & E. was responsible for providing him with a safe place of employment and further erred by instructing as a standard of care the application of the Baltimore City Building Code and B.G. & E.'s own regulations regarding the use of ladders.

Synoptically, appellant's argument is that it is clear from the testimony that Thompson was of normal intelligence in his position as an insulator and must have understood the danger involved, thereby making his use of the scaffolding in the manner resulting in injury an assumption of risk as a matter of law. *Gibson v. Beaver*, 245 Md. 418, 421, 226 A.2d

273 (1967). As appellant interprets the testimony, it contends that Thompson admitted that toe boards were for containment of materials, not for steps and, at least when asked, recognized that they were liable to break when stepped upon. In regard to the requirement that for a risk to be assumed the assumption must be voluntary it points to *Burke v. Williams,* 244 Md. 154, 158, 223 A.2d 187 (1966), contending here as it was there that no evidence was produced that Thompson's job would have been in jeopardy had he refused to ascend the scaffold in the manner he did. We find neither argument persuasive, nor do we consider the cases cited by appellant so factually apposite as to compel a holding of assumption of risk or contributory negligence as a matter of law.

■ As appellant itself points out, citing *Bauman v. Woodfield,* 244 Md. 207, 216, 223 A.2d 364 (1966), the affirmative duty to provide an employee a reasonably safe place to work is discharged if the employer warns the employee of dangers that are not obvious or, even absent such warning, if the dangers are actually or constructively known to the employee. But what is glossed by appellant is the predicate that the employer's duty

> "... is relative and conditional, and what would be a full discharge of the duty under one set of circumstances may not be under another." *Id.*

The circumstances in this case can by no means warrant a conclusion as a matter of law, either that the danger was or should have been obvious to Thompson. Certainly, there was *no* evidence that he was warned by B.G. & E. to whom the master-servant duty to provide a safe place of employment applies. *Id.* and see *LeVonas v. Acme Paper Board Co.,* 184 Md. 16, 19–20, 40 A.2d 43 (1944).

Thompson observed the erection of the scaffold by the company and watched company employees ascend it in that same manner for two weeks before the accident. It is inferable from that, together with Thompson's own use of it during that period, that any danger that might initially have

been apparent to him was assuaged by company employee use without constraint or incident. This alone would overcome appellant's reliance on *Gibson, supra,* that the danger should have been clear to one in Thompson's position because it obviously was not clear to B.G. & E., or its employees in Thompson's position. This then leaves this case as

". . . the usual case, his knowledge and appreciation of the danger will be a question for the jury." *Gibson, supra* 245 Md. at 421, 226 A.2d 273, quoting Prosser, *Torts* (2d ed. 1955) 310.

Appellant's supporting argument that appellee admitted his knowledge of the dangerous propensity of improper use of the toe board simply does not address itself to that circumstance at the time of the accident. The questioning pointed to by B.G. & E. clearly was to elicit Thompson's present knowledge abstractly and did not address what he knew before the accident or what appeared to him under the pre-accident circumstances, only what abstractly he knew might result.

"Q   Just two other questions, Mr. Thompson, before I conclude. Before your eight years experience as an insulation mechanic, and having climbed and been on scaffolds on numerous jobs, you were aware that the purpose of a toeboard around the scaffold is to keep the tools and materials from falling off, and the toeboard itself is not intended to be a bearing surface, is that correct?

A   Yes, sir.

\*   \*   \*   \*   \*   \*

Q   Mr. Thompson, when I say, a toeboard was not a bearing surface, what I meant, it is not there to bear weight, it is to keep things from going off the scaffold, you understood that, didn't you?

A   Yes, I understood what you meant, yes.

Q   You know you are not supposed to stand on a toeboard, it is not intended to bear your weight?

A   Not intended, no, sir.

\*   \*   \*   \*   \*   \*

Q   What is improper about stepping on the toe-board?

A   Liable to break.

Q   And you were aware of that, weren't you?  You were aware when you stepped on it that it was improper because it is liable to break?

A   Yes, sir."

But appellant leaves out the part of its own cross-examination wherein Thompson explained why he thought in this instance it must have been safe.  First, while conceding that the normal toe board use is not generally intended as a step, the scaffold construction here left no alternative.  Secondly, this particular toe board was obviously intended for that purpose because other people used it as the only means of ascent, as did he.

"Q   You were aware that this toe-board that you stepped on was not there for that particular purpose?

A   No, I didn't.

Q   You didn't what?  You didn't know that?

A   I knew the toe-board was there to keep things from falling out from inside of the scaffolding.

Q   You were aware it was not a safe thing to step on, weren't you?

A   Since it wasn't a passageway to get on the scaffold, I thought it was there to climb over, to use to get over the top of the rail.  Like it was, everybody else did.

Q   You didn't answer my question, sir.  I asked you, did you know that—did you feel this was a safe procedure to take, to step, put your entire weight on a toe-board, which board is used to keep objects from falling off?

A   Oh, yes, sir.

Q   Yes, sir, what?

A   Yes, sir, I think it was safe.

Q   You thought it was safe?

A   Sure.  I have used it other days the same as other people, so I figured it was safe."

Appellant apparently asked these few too many questions which permitted the logical explanation under the circum-

stance. See *Parks v. State,* 47 Md.App. 141, 142, 422 A.2d 384 (1980).[1] In *Kahlenberg v. Goldstein,* 290 Md. 477, 497, 431 A.2d 76 (1981), the characterization of a plaintiff's own testimony relating to her knowledge of the danger—under the circumstances—was implicitly sufficient to create a factual question for the jury to resolve on the issue of the plaintiff's assumption of risk.

If that were not enough, however, we pointed out in *Rountree v. Lerner Dev. Co.,* 52 Md.App. 281, 284, 447 A.2d 902 (1982), that the doctrine of assumption of risk has two requirements. Quoting Prosser, *Law of Torts* (4th ed. 1971) 447, we said:

> " 'The defense of assumption of risk is in fact quite narrowly confined and restricted by two requirements: first, that the plaintiff must know and understand the risk he is incurring, and second, that his choice to incur it must be entirely free and voluntary.' "

With respect to the second restriction on the availability of the defense we continued, quoting Prosser:

> " 'The second important limitation upon the defense of assumption of risk is that the plaintiff is not barred from recovery unless his choice is a free and voluntary one. There must first of all, of course, be some manifestation of consent to relieve the defendant of the obligation of reasonable conduct. It is not every deliberate encountering of a known danger which is reasonably to be interpreted as evidence of such consent.' " *Id.* at 284, 447 A.2d 902.

Apropos that limitation in *Rountree* we found that the evidence did not indicate that there was an alternative route of egress open to the plaintiff there. The same is indicated by the evidence here. Thompson testified that he stepped on the toe board because there was no other means of access

---

1. The same mistake was made by the fictional criminal defendant's lawyer who elicited an admission from an eyewitness that he did not see the defendant bite the plaintiff's ear off in a fight. Had he not asked then why he so contended, he would not have heard the fateful reply: "Because I saw him spit it out."

to the platform open to him through the 38½" guardrails. On one occasion he had gotten above the steam pipes a distance away from the scaffold, walked over the maze of pipes high in the air and dropped 5 to 6 feet to the platform below. That clearly is not a "reasonable" alternative access to the platform. Neither is the manner used by the acting foreman who had previously obtained the use of a 16 foot ladder, sat on the top rail and swung his legs over, dropping down to the platform. That was even testified to by experts as hazardous and unsafe. Thompson had no reasonable alternative access supplied by B.G. & E.

Furthermore, B.G. & E.'s reliance on *Benedetto v. Balto. Gas & Elec. Co.,* 30 Md.App. 171, 350 A.2d 712 (1976) and *Burke, supra,* that there was no evidence that Thompson's job would have been in jeopardy had he declined "to use the scaffold or the ladder" supplied by the employer is simply not so. Those cases are not apposite. In *Benedetto,* the plaintiff who crossed a plank over mud and debris was not an employee, nor was he in a no-alternative posture. In *Burke,* the evidence showed that the delivery man 1) was not an employee 2) was not *required* to go beyond the periphery of the construction site into the more dangerous area 3) nor was he subject to dismissal sanctions for refusal.

Thompson, however, was hired and assigned to duties that could only be performed from the particular scaffold platform constructed by B.G. & E. which could only be reached in the manner so provided in which Thompson was injured. The key, of course, is the fact that the possibility of danger was not so clear to him as to compel its probability as a matter of law. The scaffold was assigned to B.G. & E.'s employees' use in the same manner utilized by appellee, yet the Company now argues such use should have been clearly and obviously dangerous to any reasonable person. Such conduct either evidences the imperceptibility of the danger or it exhibits a callous disregard for its employees.

The two peripheral issues are more obviously unpersuasive. Relying upon our opinion in *Murphy v. Stuart M.*

*Smith, Inc.,* 53 Md.App. 640, 455 A.2d 69 (1983), appellant contends that:

"The trial court erred in instructing the jury as to certain legal duties imposed upon the Appellant by the Federal Occupational Safety and Health Act and adopted by reference into the Code of Maryland Regulations."

The trial judge instructed the jury that the Federal Occupational Safety and Health Act adopted by reference into the Code of Maryland Regulations imposes certain legal duties upon the appellant and its employees, a violation of which can be considered as negligence. He instructed the jury that if they found that the appellant and its employees failed to provide safe access to the scaffolding, they could consider such failure evidence of negligence. Because the regulations referred to are applicable between an employer and its employees, appellant relies upon our observation in *Murphy, supra,* that the Maryland act (MOSHA) based upon the Federal act (OSHA) requiring an employer to provide a safe place of employment for his employees is by its language limited to employees. Thus he implies that our holding there precluded jury consideration of any violations by B.G. & E. of similar safety standards imposed upon employers for the benefit of its employees.

In *Murphy,* however, we pointed out circumstances wherein the duty of the employer may be owed to someone other than its own employee. One of those circumstances was where employers have "actually created a hazardous condition which violated specific OSHA regulations and to which its own and another's employees were exposed, . . . or had actual and substantial physical control over the work area, and actual responsibility for the hazardous condition." *Id.* at 643, 455 A.2d 69.

Implicitly, we acknowledged that exception in *Murphy* although it was not factually relevant there. It is, of course, quite relevant here because B.G. & E. admits that it erected and constructed the hazardous condition and retained actual control over the work area to which it had

assigned Thompson. If there were any question in *Murphy* whether that circumstance applied to an employer's duty in Maryland, we here lay to rest such doubt, at least as it applies to subcontractors assigned to such employers.

■ Even if that were not so, however, the safety requirements relating to the duty to provide a safe place of employment imposed upon employers for the benefit of employees are clearly applicable to independent contractors and their employees engaged by such employers. The Court of Appeals said in *LeVonas, supra* 184 Md. at 20, 40 A.2d 43, that:

> "If the owner employs an independent contractor to do certain work, he owes to employees of the contractor the same duty he would owe to employees of his own to furnish them a safe place to work."

See also *Bauman, supra* 244 Md. at 217, 223 A.2d 364.

■ This "duty" is little more than that owed any business invitee whatever his designation. Yet here we need only hold that for purposes of permitting the jury to consider as evidence of negligence violations of work-safety regulations, B.G. & E. owed to Thompson the same duty it owed its employees. *LeVonas* and *Bauman,* both *supra.*

Grasping at a few final straws, appellant complains that the trial judge instructed the jury regarding the question of whether the scaffold erection violated the Baltimore City Building Code. B.G. & E. does not complain of the wording of the instruction, but questions its relevance predicated upon its contention that the scaffold condition was not the proximate cause of the accident; *i.e.,* that Thompson's contributory negligence and/or assumption of risk was the cause. The argument obviously falls with the failure of its foundation which collapsed due to its poor construction.

■ The non-issue Parthian dart directed at an instruction pertaining to appellant's regulations regarding use of ladders also misses its mark. The instruction was relevant to the facts proven because the absence of a fixed, appropriately lengthened ladder was part and parcel of the unaccessibil-

ity which caused appellee to use the only visible means of access available.

JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.