996 A.2d 399

**Kelly Lynn STRUB et al.**

v.

**C & M BUILDERS, LLC et al.**

**No. 53, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

May 28, 2010.

2

Patrick A. Ferris of Baltimore, MD (Maria R. DeLacy of Baltimore, MD, Daniel J. Earnshaw of Edgewood, MD, on the brief), for appellant.

William N. Zifchak (Sasscer, Clagett & Bucher, on the brief), Upper Marlboro, MD, for appellee.

Panel: DAVIS, WRIGHT and IRMA S. RAKER, (Retired, Specially Assigned), JJ.

DAVIS, J.

Kelly Lynn Strub, appellant/cross-appellee,[1] appeals from the judgment of the Circuit Court for Baltimore City in favor

---

1. Although this appeal is captioned Kelly Lynn Strub, *et al. v. C & M Builders, LLC, et al.*, the other plaintiffs in the trial court, Deborah Claridge, individually and as Personal Representative of the Estate of

of C & M Builders, LLC (C & M), appellee/cross-appellant, and presents one question for our review:

Did the trial court err in granting [C & M's] motion *in limine* and precluding [Strub] from offering any evidence or testimony that [C & M] either owed or breached a duty of care under OSHA and MOSHA regulations and the Multi–Employer Doctrine?

C & M raises an additional question on cross-appeal:

Did the trial court err by denying C & M's Motion for Judgment, that Nocar assumed the risk of the occurrence, and was contributorily negligent as a matter of law?

For the reasons that follow, we answer Strub's question in the affirmative and C & M's question in the negative. Accordingly, we reverse, in part, and affirm, in part.

## PROCEDURAL AND FACTUAL BACKGROUND

Strub filed a Complaint on behalf of her minor son, Sebashton Charles Nocar, in the circuit court alleging that C & M's negligence caused the death of his father, Wayne Barry Nocar, II (Nocar) who suffered fatal injuries after he fell from the third floor of a row home while working as an HVAC subcontractor in a renovation of a Baltimore City row home.

Prior to trial, C & M moved *in limine* to prevent Strub's expert witnesses from testifying that, in failing to cover the stairwell openings on the construction site, C & M violated MOSHA and OSHA standards; thus, it breached a statutory duty owed to Nocar. Specifically, the parties disagreed as to whether C & M owed a duty to Nocar when Nocar was an employee of Comfort Masters Cooling and Heating, Inc. (Comfort Masters). Appellant contended that C & M was

---

the Late Wayne Barry Nocar, II, entered a stipulation of dismissal, settling and dismissing their claims. Although some pleadings in the record are captioned so as to indicate that there were multiple defendants to the action, the only defendant to the action that is apparent in the record is C & M and C & M is the only other party that filed a brief in this appeal. Accordingly, we shall refer to the parties as Strub and C & M.

obligated to protect not only its own employees from the fall hazard created by the open stair ways, but also the employees of other subcontractors because it created the hazard.

Strub proffered that Brent Leisenring, an engineer and former MOSHA inspector, would testify that C & M violated the statutes in failing to secure the openings on the construction site. Strub further explained, during the hearing on C & M's motion, that following his testimony, Strub intended to request that the trial court instruct the jury "that the violation of MOSH standards is evidence of negligence." C & M argued that this Court held, in *Murphy v. Stuart M. Smith, Inc.*, 53 Md.App. 640, 455 A.2d 69 (1983), that the statutes did not apply to this case, imposing a duty on C & M to a person who was not one of its employees. The trial court permitted Leisenring to testify, but restricted his testimony, ruling:

All Right. Here's how we're going to deal with this. I don't think you can properly use the MOSH [sic] expert to testify that—if he wants to testify on industry standards regarding the preparation of the job site as was done by the defendant, that's fine.

But if he's simply saying it violates MOSH [sic] standards, therefore there's a duty owed and there's negligence, I don't think he can do that based on what you gentlemen have told me.

The trial court then clarified its ruling, stating:

. . . if he's going to discuss industry standards, and that's what he's going to discuss, we'll allow him.

. . . .

But I don't want him saying there's a legal duty owed.

. . . .

He can say there was negligence based on industry standards.

Counsel for Strub sought clarification of the court's ruling and the following transpired:

Counsel for Strub: So as I understand your ruling Ken Johnson is excluded but Brent Leisenring is allowed to testify?

The Court: That's correct.

. . . .

Counsel for Strub: You're probably not going to want to hear this. And I think this will be legal argument actually now that I think about it. Because I do have an argument—well, Mr. Leisenring, the other expert, is only going to be permitted to testify to industry standards. He's not going to be allowed to talk about MOSH [sic] or OSHA, am I correct?

The Court: Right.

The case proceeded to trial during which the following evidence was presented. C & M entered into an oral contract with Bayside Properties, Inc. (Bayside), the general contractor, to finish framing a row home on Fleet Street. Bayside began the renovation project, "gutting" the building and framing the first floor, leaving nothing but a "shell." All that was in place at the time that C & M began its work was the exterior walls and a roof. The first floor had a rectangular opening prior to C & M's work, that was not guarded, for the steel staircase that was to be installed in the basement at a later date. C & M agreed to frame the second and third floors of the building and to leave openings in the floors for staircases to be installed directly above the existing opening in the first floor.

Prior to Leisenring's testimony, C & M moved to exclude him as a witness because, in light of the court's earlier ruling on its motion *in limine*, he was barred from testifying to OSHA and MOSHA standards and was limited to testifying to customary practices of the construction industry. C & M argued that Leisenring never testified to the practices of the industry generally during discovery and, thus, his testimony should be excluded. The court explained that the basis of its earlier ruling limiting Leisenring's testimony was that it agreed with C & M that the expert should not be permitted to

testify that MOSHA or OSHA imposed a statutory duty on C & M to cover the openings in the floors because duty is a legal question and not something to which an expert can testify. The parties again disputed the applicability of MOSHA and OSHA and the trial court denied C & M's motion. The following transpired:

> The Court: But how can you—you know, I don't know that OSHA and MOSH [sic] don't suggest grounds for arguing that there's a breech [sic]. They just don't establish to whom the duty is owed.
>
> Counsel for Strub: That's why [Leisenring] should testify about OSHA and MOSH [sic].
>
> The Court: He can't testify as to—see, you shouldn't be asking me these questions.
>
> . . . .
>
> All right. Leave OSHA and MOSH [sic] out of this. If ... but I'm going to let him testify to what he has to say. And if you—
>
> Counsel for C & M: And it will be standard usual and customary practices?
>
> The Court: And if you—yeah, it will be practices.

Leisenring testified that in the process of framing the house, C & M created openings in the floors for staircases to be constructed at a later date. C & M did not cover the openings, exposing workers to "fall hazards greater than six feet, which violated the industry standards and was a cause of Wayne Nocar's death." Leisenring further testified that it was "predictable" that other workers would be entering the premises after C & M completed its assigned job of framing and that it is the general practice of the industry to cover and guard such holes to protect others from falling through the openings in the floors.

Christopher Chavez, part owner of C & M, testified that, at the end of their framing job on May 5, 2006, C & M removed the ladders that they had constructed to access the floors of the building and left the openings exposed, expecting that Bayside's next sub-contractor would be the company installing

the stairs. He further testified that Bayside never asked C & M to guard the openings to the stairwell for this job or any other jobs that C & M had done for Bayside in the past.

Three weeks later, on May 26, 2006, Comfort Masters sent three of its employees, Nocar, Joshua Tudor and Andrew Pfarr, to the building to install a heating and cooling system, despite the fact that the stairs had not yet been installed. The three worked for approximately three hours that morning before Nocar's fall. Throughout the morning, the three worked with only two step ladders, as they had left one behind at the shop. They planned to retrieve a third ladder from the shop on their lunch break.

Tudor testified that, in addition to forgetting a ladder, they had neglected to bring other materials necessary for the installation of a return on the third floor. He testified: "We had no collars to hook to it. So I told him, I say, 'Wayne, there's no sense of putting this return box up just so that we have to take it down in an hour....'" Nocar agreed and Tudor went down to the second floor to begin another project. Tudor testified that soon thereafter Nocar had yelled down to him while he was working on the second floor to bring his ladder up to the third floor. Tudor testified that he told Nocar that he would give him his ladder in a minute after he finished the task he was working on when Nocar "leaned down in the hole ... and said 'Oh. You using it. Never mind.'" Then, according to Tudor, Nocar said "Fuck it. I'll just climb the bitch." Three or four minutes later, Tudor heard a loud noise and heard Pfarr scream. He walked to the opening of the second floor stairwell and saw the step ladder "dangling over the third floor" and realized that Nocar had fallen from the third floor into the basement. Tudor testified that, based upon the conversation minutes before the fall, he believed that Nocar had pulled the ladder that had been nailed into the stairwell up to the third floor to use it to install the return box on the third floor. He surmised:

> The ladder was leaning right where the return box was supposed to go. The ladder was too tall to stand up in the hallway like straight. And the hallway was too narrow for

him to fit up there. So what he did is he leaned it across the hole up against the metal stud.

And the metal studs are not made for structural [sic]. So when he leaned on it, it bent and tipped the ladder.

During cross-examination, Tudor explained that he did not know for certain if Nocar fell as a result of positioning the ladder as he had described, but that he thought that he fell in that manner based on the circumstances and his knowledge of the task that Nocar was attempting to complete.

Timothy Galarnyk, a forensic investigator, testified for the defense that industry practice and industry customs would not have required C & M to cover or otherwise guard the stairwell openings. Rather, "... when a contractor is finished with their portion of the work; in other words, framing contractor is finished with their portion of the work; they leave the job site and prepare it only for the next contractor, which in this case would have been the stairway contractor." He further testified that it was typical for framing contractors to leave stairwells open in order to move large pieces of plywood between floors. Galarnyk also testified that, based upon Tudor's testimony and his examination of the vertical sheet metal stud on the third floor that the ladder was hanging from after Nocar's fall, in order for a ladder to cause such damage to a stud "it had to be loaded and twisted," *i.e.,* someone had to be standing on the ladder when it twisted.

At the conclusion of the evidence, C & M moved for judgment and argued that Nocar assumed the risk of injury and was contributorily negligent in utilizing the ladder improperly in close proximity to the stairwell opening to install the return box. The motion was denied and the case was submitted to the jury. The jury returned a verdict in favor of C & M, finding no primary negligence on its part. Thus, the jury did not reach the questions of assumption of the risk and contributory negligence. Strub filed a timely appeal and C & M filed a timely cross-appeal. Additional facts shall be supplied *infra* as warranted.

## LEGAL ANALYSIS

### I

██ Strub contends that the trial court erred in restricting Leisenring's testimony and prohibiting him from testifying regarding OSHA and MOSHA standards because, in doing so, the court implicitly made the legal determination that C & M did not owe a duty of care to Nocar under either statute because Nocar was not a C & M employee.

Generally, we review a trial court's evidentiary rulings for an abuse of discretion. *Hall v. University of Maryland Medical System Corp.*, 398 Md. 67, 82, 919 A.2d 1177 (2007); *Saxon Mortgage Servs. v. Harrison*, 186 Md.App. 228, 252, 973 A.2d 841 (2009); *Brown v. Contemporary OB/GYN Assocs.*, 143 Md.App. 199, 252, 794 A.2d 669 (2002). The threshold issue for the court's ruling in this case was its legal determination that the statutes did not apply because there was no employer-employee relationship between Nocar and C & M. The Court of Appeals has said that, "[i]f 'the trial judge's ruling involves a pure legal question, we generally review the trial court's ruling *de novo*.'" *Hall*, 398 Md. at 82, 919 A.2d 1177 (quoting *Bern–Shaw Ltd. Partnership v. Mayor and City Council of Baltimore*, 377 Md. 277, 291, 833 A.2d 502 (2003)). Thus, we shall conduct a *de novo* review.

The Maryland Occupational Safety and Health Act (MO-SHA), Md.Code (1991 Rep. Vol., 2006 Supp.), Labor & Employment, L.E. § 5–101 *et seq.*, is the State counterpart to the federal legislation embodied in the Occupation Safety and Health Act (OSHA), 29 U.S.C. § 651, *et seq.* MOSHA provides in pertinent part:

§ 5–104. **General duties of employers and employees.**

(a) *Safe employment and places of employment.*—Each employer shall provide each employee of the employer with employment and a place of employment that are:

(1) safe and healthful; and

(2) free from each recognized hazard that is causing or likely to cause death or serious physical harm to the employee.

Strub contends that, despite the plain language of the statute, C & M, although not Nocar's employer, owed Nocar a duty of care pursuant to MOSHA. Thus, Strub further posits that the trial court erred in prohibiting Leisenring from testifying that the open holes in the floor violated MOSHA, under which it owed a duty of care to Nocar.[2]

█ The basis for this duty, according to Strub, is the "multi-employer" doctrine. Strub cites *Universal Construction Company, Inc. v. Occupational Safety and Health Review Commission*, 182 F.3d 726, 730 (10th Cir.1999), in support of her contention. *Universal Construction* propounds the doctrine as follows, *id.* at 728:

> The multi-employer doctrine provides that an employer who controls or creates a worksite safety hazard may be liable under the Occupational Safety and Health Act even if the employees threatened by the hazard are solely employees of another employer. The doctrine has its genesis in the construction industry where numerous employers, often subcontractors, work in the same general area, and where hazards created by one employer often pose dangers to

---

2. Strub asserts that C & M violated the federal OSHA regulations. 29 C.F.R. § 1910.23 provides in pertinent part:

**Guarding floor and wall openings and holes.**

(a) Protection for floor openings. (1) Every stairway floor opening shall be guarded by a standard railing constructed in accordance with paragraph (e) of this section. The railing shall be provided on all exposed sides (except at entrance to stairway). For infrequently used stairways where traffic across the opening prevents the use of fixed standard railing (as when located in aisle spaces, etc.), the guard shall consist of a hinged floor opening cover of standard strength and construction and removable standard railings on all exposed sides (except at entrance to stairway).

(2) Every ladderway floor opening or platform shall be guarded by a standard railing with standard toeboard on all exposed sides (except at entrance to opening), with the passage through the railing either provided with a swinging gate or so offset that a person cannot walk directly into the opening.

employees of other employers. The Secretary has imposed liability under the doctrine since the 1970's and has steadfastly maintained the doctrine is supported by the language and spirit of the Act. The Secretary's interpretation has been accepted in one form or another in at least five circuits, and rejected outright in only one.

Strub also cites a number of cases where federal courts have applied the doctrine to hold an employer liable for an OSHA violation, *i.e.*, the employer's citation has been upheld under the doctrine, although the violation was committed by another contractor or endangered the employees of another contractor. In *Universal Construction Company,* the Tenth Circuit affirmed a final order of the Occupational Safety and Health Review Commission imposing a penalty against Universal, a general contractor, based upon the "multi-employer worksite doctrine." *Id.* at 732. That court adopted the doctrine because Universal, as the general contractor, observed the OSHA violation and "had plenary control and authority over the worksite and could itself correct a hazard created by any subcontractor...." *Id.* at 732.

Strub also cites *Beatty Equipment Leasing, Inc. v. Secretary of Labor, United States Dep't of Labor,* 577 F.2d 534 (9th Cir.1978), where the Ninth Circuit upheld a citation issued to a "materialman" for a general contractor for failure to comply with scaffolding standards under OSHA. The court observed that, "for all relevant purposes, petitioner functioned as a subcontractor in this case." *Id.* at 537. It adopted the multi-employer worksite doctrine and upheld the citation issued to the subcontractor, even though the violation for which it was responsible only exposed employees of other subcontractors to the hazard because "[i]t facilitates the broad remedial purpose of [OSHA] which Congress declared is 'to assure so far as possible every working man and woman in the Nation safe and healthful working conditions' 29 U.S.C. § 651 ... 'Congress clearly intended to require employers to eliminate all foreseeable and preventable hazards.'" *Id.* (quoting *California Stevedore and Ballast Co. v. OSHRC,* 517 F.2d 986, 988 (9th Cir.1975)).

Finally, Strub cites *Solis v. Summit Contractors, Inc.,* 558 F.3d 815 (8th Cir.2009), and asserts that the trial court's ruling was erroneously based upon the earlier decision by the Occupational Health and Safety Review Commission (OSHRC) in that case wherein the OSHRC vacated an OSHA citation against a general contractor for a hazard created by one of its subcontractors. Strub argues that the case was not yet decided when the trial in the instant case took place, but that, in light of the Eighth Circuit's recent holding, we should reverse the trial court's ruling. Initially, we observe that, although C & M cited the case in its motion *in limine,* there is absolutely no indication in the record that the trial court relied upon *Solis* in making its determination. Notwithstanding that fact, we find *Solis* instructive as it chronicles the history and evolution of the multi-employer worksite doctrine and its adoption in the federal courts.

The Eighth Circuit explained that the multi-employer doctrine has its basis in the specific duty provided in 29 U.S.C. § 654 subsection (a)(2) "to comply with standards for the good of all employees on a multi-employer worksite." *Id.* at 818. The court further delineated the evolution of the doctrine and the practice of citing employers for violations committed by other contractors or non-employees, noting that, "[a]s part of OSHA's inception, Congress authorized the Secretary to adopt numerous preexisting federal standards, including those of the Construction Safety Act, as OSHA standards. . . ." *Id.* at 818. Thus, the Secretary of Labor promulgated a series of regulations pursuant to that authority and also enacted a Field Operations Manual, wherein it first established "the Secretary's multi-employer worksite policy, a policy that indicates which employers at a multi-employer construction site OSHA could cite for violations." *Id.* at 819. The original multi-employer worksite exceptions were "the creating employer and the exposing employer citation polices, but not the controlling employer citation policy." *Id.* Although the OSHRC originally construed these policies very narrowly by citing employers for violations of others only when their own employees were exposed to the hazard, the court observed that,

by 1975, the Second Circuit and the Seventh Circuit rejected the narrow interpretations, questioning whether an employer of a general contractor needed to be exposed to the violation in order to make a general contractor liable under OSHA. *Id.* at 820 (citing *Brennan v. OSHRC*, 513 F.2d 1032, 1308 (2d Cir.1975); *Anning–Johnson Co. v. OSHRC*, 516 F.2d 1081, 1091 n. 21 (7th Cir.1975)). Thus, "OSHRC announced its revised position that a contractor who has either created a hazard or controls a hazardous condition has a duty under § 654(a)(2) to comply with OSHA standards even if the contractor's own employees are not exposed to the hazard." *Id.* at 820–21 (citing *Grossman Steel & Aluminum Corp.*, 4 BNA OSHC 1185, 1975–1976 CCH OSHD 20, 691 (O.S.H.R.C. May 12, 1976)).

Ultimately, the *Solis* Court observed that in 1981 "the correcting employer citation policy was added" and then, in 1994, "the multi-employer worksite was amended to add the creating employer and the controlling employer citation policies." The current version of the OSHA citation manual contains "the same four citation policies—exposing employer, correcting employer, creating employer and controlling employer." *Id.* at 821. The *Solis* Court held that the controlling employer citation policy was not barred by 29 C.F.R. § 1910.12(a).[3] Thus, the court rejected Solis' argument that, as a general contractor, it could not be held liable for a subcontractor's OSHA violation simply because it controlled the work environment. *Id.* at 824.

In light of the foregoing authorities, Strub posits that, because C & M could have been cited as a creating employer

---

3. 29 C.F.R. § 1910.12(a) provides:

(a) Standards. The standards prescribed in part 1926 of this chapter are adopted as occupational safety and health standards under section 6 of the Act and shall apply, according to the provisions thereof, to every employment and place of employment of every employee engaged in construction work. Each employer shall protect the employment and places of employment of each of his employees engaged in construction work by complying with the appropriate standards prescribed in this paragraph.

under the multi-employer worksite doctrine, Maryland should adopt the doctrine and hold that C & M owed Nocar a duty of care under the statute. C & M contends that, notwithstanding the authorities cited by Strub, the language in L.E. § 5–104 limits the duty to comply with MOSHA to the employer-employee relationship. L.E. § 5–104 provides in pertinent part, "[e]ach employer shall provide each employee of the employer with employment and a place of employment . . ." that complies with MOSHA. Further, C & M posits that "this precise issue" was addressed in *Murphy v. Stuart M. Smith, Inc.*, 53 Md.App. 640, 455 A.2d 69 (1983). C & M believes our decision in *Murphy* to be determinative of the issue before us. We agree, but not for the same reasons advanced by C & M. We explain.

In *Murphy*, a route salesman for Tastykake, Inc. suffered injuries while loading his work van, in the dark, at a warehouse owned by the defendant and leased to Murphy's employer. Murphy claimed that he lost his footing and fell due to inadequate lighting at the facility. *Id.* Murphy sued the property owner based upon two alternate theories: (1) that the property owner retained control of the area in which he fell and owed him a duty as a business invitee and (2) that the property owner owed him a duty of care under MOSHA. *Id.* On appeal, Murphy argued that the trial court erred in instructing the jury that, "as a matter of law, any duties owed to [him] pursuant to [MOSHA], were not applicable in this case because [the property owner] was not Mr. Murphy's employer." *Id.* at 642, 455 A.2d 69. We acknowledged that Murphy cited "a series of federal cases which have applied a duty under certain circumstances upon someone other than an employer to maintain safe premises for another's employees." *Id.* Those exceptions included (1) where the jurisdiction's OSHA statute specifically limited the duty to keeping the place of employment safe "for employees," (2) "where the employer was, or could have been, found to have voluntarily assumed a duty to comply with OSHA regulations for the benefit of persons other than his own employees . . ." and (3) when "owners or employers who have either actually created a

hazardous condition which violated specific OSHA regulations and to which its own and another's employees were exposed . . . *or* had actual and substantial physical control over the work area, and actual responsibility for the hazardous condition." *Id.* at 643, 455 A.2d 69 (citations omitted) (emphasis added). We also acknowledged that the Fifth Circuit "flatly held that OSHA does *not* create a duty on behalf of an employer to any persons other than its own employees, regardless of any other factual circumstance presented." *Id.* at 644, 455 A.2d 69 (citations omitted).

We declined to "go to the extreme of the fifth circuit" because "we are a Court purposed to decide cases on the facts presented rather than proclaim in black letter the applicability of law for all purposes." We instead held, *id.* at 644, 455 A.2d 69:

It will suffice that under the facts of this case the Maryland Act is clearly limited, placing the duty on the "employer" for the benefit of "his employees." Rules of construction are to be resorted to only when there is a doubt, ambiguity, or uncertainty, and they are never to be used to create doubt, only to remove it. *John McShain, Inc. v. State,* 287 Md. 297, 301 [411 A.2d 1048] (1980). This is another case for applying the canon of construction of the wag whom Justice Frankfurter quoted as saying when the legislative history is doubtful, go to the statute. *Greenwood v. United States,* 350 U.S. 366, 374 [76 S.Ct. 410, 100 L.Ed. 412] (1956). In doing so we find that neither its statutory language nor legislative intent can be stretched beyond the fair implication of the statute's words or its purpose. *Soper v. Montgomery County,* 294 Md. 331, 335 [449 A.2d 1158] (1982). Because the issue had been injected into the case by [Murphy], the trial judge quite properly dispelled the jury's doubts by instructing that the statutory duty had no applicability in this case.

C & M asserts that, "since *Murphy,* two exceptions to this principle have been recognized in Maryland. But, neither exception is apposite here." C & M points out that, in *Baltimore Gas & Electric Co. v. Thompson,* 57 Md.App. 642,

471 A.2d 768 (1984), we recognized the "actual control exception" and, in *Brady v. Ralph M. Parsons Co.*, 82 Md.App. 519, 572 A.2d 1115 (1990), *aff'd*, 327 Md. 275, 609 A.2d 297 (1992), we recognized the "assumed duty" exception to the general rule that employers are only liable to their own employees to provide a safe workplace under MOSHA.

In *Thompson*, we affirmed a trial court's instruction to the jury that "B.G. & E. was responsible for providing [Thompson] with a safe place of employment . . ." when Thompson was not an employee of B.G. & E. 57 Md.App. at 645, 471 A.2d 768. Thompson, an employee hired by Insul–Temp/Airco, Inc., was performing a job for B.G. & E. and, while climbing scaffolding erected by B.G. & E., fell to the floor and suffered permanent injuries. The jury returned a verdict in favor of Thompson. *Id.* On appeal, B.G. & E. argued that it did not owe a duty to provide a safe workplace under MOSHA or OSHA, relying on *Murphy, supra.* Thus, it maintained that the trial court erred in instructing the jury that, "if they found that [B.G. & E.] and its employees failed to provide safe access to the scaffolding, they could consider such failure evidence of negligence." *Id.* at 651, 471 A.2d 768. We rejected B.G. & E's contention and explained:

> In *Murphy*, however, we pointed out circumstances wherein the duty of the employer may be owed to someone other than its own employee. One of those circumstances was where employers have "actually created a hazardous condition which violated specific OSHA regulations and to which its own and another's employees were exposed, . . . or had actual and substantial physical control over the work area, and actual responsibility for the hazardous condition." *Id.* at 643, 455 A.2d 69.
>
> Implicitly, we acknowledged that exception in *Murphy* although it was not factually relevant there. It is, of course, quite relevant here because B.G. & E. admits that it erected and constructed the hazardous condition and retained actual control over the work area to which it had assigned Thompson. If there were any question in *Murphy* whether that circumstance applied to an employer's duty in Maryland, we

here lay to rest such doubt, at least as it applies to subcontractors assigned to such employers.

*Id.* at 651–52, 471 A.2d 768.

Six years later, in *Brady,* we recognized another circumstance where an employer may owe a duty to a non-employee to comply with MOSHA. 82 Md.App. at 527, 572 A.2d 1115. Brady, a sheet metal worker, died after falling from scaffolding erected during the construction of the Cold Spring Lane Station of the Baltimore Region Rapid Transit System. *Id.* at 521, 572 A.2d 1115. The Mass Transit Administration (MTA) entered into three contracts as part of the construction project, one with a construction company to serve as the general contractor, one with another company to administer a safety program for the site and a third with Parsons to provide "inspection and safety services for MTA." *Id.* The general contractor, in turn, subcontracted a portion of the construction work to Brady's employer. *Id.* Brady's survivors sued Parsons for "negligent performance of its contractual safety responsibilities at the construction site." *Id.* at 523, 572 A.2d 1115. Initially, summary judgment was granted in favor of Parsons. The Court of Appeals reversed and remanded the case and, on remand, the jury found Parsons negligent and also found that Brady was contributorily negligent and had assumed the risk. *Id.* at 523–24, 572 A.2d 1115. Brady's survivors appealed again, asserting that the trial court erred in instructing the jury on the defenses of contributory negligence and assumption of the risk and argued that Parsons owed a nondelegable duty to comply with safety regulations and that the duty was absolute. *Id.* at 524, 572 A.2d 1115.

We agreed with Brady's contention, in part, because we determined that Parsons' duty to Brady arose as a result of his contract with MTA, but we declined to hold that the duty was absolute and that the defenses did not apply. *Id.* at 525, 572 A.2d 1115. Again citing *Murphy,* we explained that, "generally, the duty created by MOSHA runs from the employer to its own employees." *Id.* at 527, 572 A.2d 1115 (citing *Murphy,* 53 Md.App. at 643, 455 A.2d 69). But, we pointed out that, in *Murphy,* we had previously acknowledged that an

employer may in some circumstances owe a duty to someone other than its own employees. "One of these circumstances is where the employer 'voluntarily assumed a duty to comply with OSHA regulations for the benefit of persons other than his own employees.'" *Id.* (quoting *Murphy,* 53 Md.App. at 643, 455 A.2d 69).[4]

We held that the "assumed duty" exception was relevant in *Brady* "since Parsons assumed the responsibility for safety on the construction site." *Id.* We further observed:

> Moreover, although we have not expressly adopted the "assumed duty exception," Maryland appellate courts have utilized the policy behind it as a basis for imposing liability: that is, where a duty of due care has been assumed by contract or conduct, a worker not in privity is protected.

*Id.* at 528, 572 A.2d 1115.

In holding that Parsons owed a duty to Brady, we did not establish a statutory duty under MOSHA, but instead applied existing case law to reinforce "the policy of holding those liable who have assumed a duty of care." *Id.* at 529, 572 A.2d 1115. Noting that "[t]his is particularly true where, as here, there is a multi-employer worksite where employees of a number of contractors are present." *Id.* Further, we adopted the assumed duty exception. We explained, *id.*:

> In light of the policy set forth in *Krieger* [*v. J.E. Greiner Co.,* 282 Md. 50, 382 A.2d 1069 (1978)] and *Cutlip* [*v. Lucky Stores, Inc.,* 22 Md.App. 673, 325 A.2d 432 (1974)], we conclude that one who assumes the contractual obligation to supervise and enforce safety on a multi-employer worksite owes a duty of reasonable care to a worker even though he or she has no contractual privity. Since the "assumed duty exception" encompasses this conclusion, we hereby adopt that exception.

In adopting the assumed duty exception, we rejected Brady's argument that, "since OSHA and MOSHA were designed

---

**4.** In *Brady,* we also acknowledged the other exception first recognized in *Murphy* and first adopted in *Thompson, supra. Id.* at n. 5.

to protect workers from injury and to ensure a workplace free from recognized hazards, it would be inconsistent with the purpose of the statutes to allow the interposition of [contributory negligence and assumption of the risk]." *Id.* at 530, 572 A.2d 1115. *See Brady v. Ralph M. Parsons Co.,* 327 Md. at 294–95, 609 A.2d 297 (affirming our holding). We opined:

> MOSHA was not enacted to create an action for damages in favor of an employee. This is manifest from the preventive and noncompensatory nature of MOSHA. The Act is designed not to punish but, rather, to achieve compliance with safety standards and the abatement of hazards. Under the Act, no remedy is provided to the employee. Instead, a penalty is imposed on the employer who has been cited for an unsafe condition. In fact, the statute may be violated even though no accident or injury occurs. To this end, we have held that the assumption of risk and contributory negligence defenses will not exculpate an employer who is charged with a violation under MOSHA. *Mardo Homes, Inc. v. Commissioner of Labor and Industry,* 35 Md.App. 260, 267, 370 A.2d 144 (1977).
>
> *Mardo Homes,* however, does not apply in tort actions since it is only controlling to the extent that an employer, who has been cited with a violation under MOSHA, may not assert these defenses. A citation for a safety violation is entirely distinct from the type of claim at issue here, namely, a civil cause of action for damages in a personal injury action against a third party who is not the decedent's employer.

*Id.* at 533–34, 572 A.2d 1115.

Both parties agree that the assumed duty exception does not apply in the case *sub judice.* Strub, however, argues that the "creating employer" exception was recognized in *Murphy* and that it applies in this case while C & M's rejoinder is that the exception first recognized in *Murphy* and later adopted in *Thompson* is limited to circumstances where the employer not only creates the hazardous condition that violates OSHA or MOSHA, but also exercises actual control over the work area and the job being performed. We agree with Strub.

In *Murphy,* we acknowledged that an employer may owe a duty to a non-employee to maintain a safe workplace under OSHA. We observed:

> The third and final circumstance relates to owners or employers who have either actually created a hazardous condition which violated specific OSHA regulations and to which its own and another's employees were exposed, *Wendland v. Ridgefield Const. Services, Inc.,* [184 Conn. 173] 439 A.2d 954 (Conn.1981), *or* had actual and substantial physical control over the work area, and actual responsibility for the hazardous condition.

*Murphy,* 53 Md.App. at 643, 455 A.2d 69 (emphasis added). Although not factually relevant to our holding in *Murphy,* when faced with the relevant factual scenario in *Thompson,* we did not hesitate to adopt the exception where the " 'employer had actual and substantial physical control over the work area, and actual responsibility for the hazardous condition.' " *Thompson,* 57 Md.App. at 651, 471 A.2d 768 (quoting *Murphy,* 53 Md.App. at 643, 455 A.2d 69). C & M urges that the exception originally recognized in *Murphy* and adopted in *Thompson* does not apply to these facts because C & M did not retain control over the work area, nor did it control Nocar's work assignments. While we agree that C & M did not exercise control in this instance, it was undisputed that C & M did *create* the hazard when it framed the second and third floors of the row home and left the stairwell openings uncovered and exposed its own employees to the hazard. Liability under these circumstances was recognized in both *Murphy* and *Thompson,* but in *Thompson,* it was the control aspect of the exception that applied.

In both *Murphy* and *Thompson,* we previously acknowledged that there are two alternative ways that an employer can be liable to someone other than its own employees under MOSHA, *i.e.* (1) by creating a hazardous condition in violation of OSHA regulations "to which its own and another's employees were exposed" *or* (2) by exercising "substantial physical control over the work area, and actual responsibility for the hazardous condition." *Thompson,* 57 Md.App. at 651, 471

A.2d 768. Having previously recognized this "creating employer" exception, we hereby adopt it as it is clearly applicable to the case at hand. Accordingly, we need not decide whether all four of the categories of the multi-employer worksite doctrine cited by Strub apply in Maryland.[5]

■ The circuit court erred in precluding all testimony regarding OSHA or MOSHA because C & M, as an employer that created the openings in the stairwells, exposed its own employees to the hazard and left them unguarded, in violation of MOSHA, could be liable under MOSHA for its violation and, thus, owed Strub a duty to maintain a safe workplace, as explained *supra*. We pause, however, to point out that the trial court did not err in ruling that Strub's expert witness could not testify to the existence of a legal duty. As C & M aptly points out, "the existence of a legal duty is a question of law, to be decided by the court." *Doe v. Pharmacia & Upjohn Co., Inc.*, 388 Md. 407, 414, 879 A.2d 1088 (2005) (citations omitted). Nevertheless, Leisenring should not have been totally barred from testifying about MOSHA requirements and whether the conditions of the construction site would have constituted a violation.

■ Finally, we must reiterate that, in holding that C & M, as the creating employer, who also exposed its own employees to the hazard, owed a duty to Nocar to comply with MOSHA, we do not hold that a violation of MOSHA automatically gives rise to a tort duty. "MOSHA was not enacted to create an action for damages ... the Act is designed not to punish ... no remedy is provided to the employee." *Brady*, 82 Md.App. at 533, 572 A.2d 1115.[6]

---

**5.** Additionally, because we decline to address all of the categories of the multi-employer worksite doctrine, we similarly decline to address C & M's contention that the four categories of the doctrine, as discussed in *Solis*, 558 F.3d at 824–30, are limited "to places of employment where the employer actually has employees."

**6.** It is for this reason that we believe that Strub's reliance on *Maryland Sales & Service Corp. v. Howell*, 19 Md.App. 352, 311 A.2d 432 (1973) to be inapposite. In *Maryland Sales,* we held that a subcontractor may,

## II

■ Because the trial court erred in precluding all testimony regarding MOSHA and OSHA, we are constrained to turn to C & M's alternative argument in its cross-appeal for the purposes of remand. C & M contends that the circuit court erred in denying its motion for judgment at the conclusion of the case because Nocar assumed the risk and/or was contributorily negligent. Under either theory, C & M asserts that Strub should have been barred from recovery as a matter of law.

"We review a trial court's decision to deny a motion for judgment at the conclusion of the evidence *de novo.*" *Wilkens Square, LLLP v. W.C. Pinkard & Co.*, 189 Md.App. 256, 267, 984 A.2d 329 (2009) (citing *Lowery v. Smithsburg Emergency Med. Serv.*, 173 Md.App. 662, 682–83, 920 A.2d 546 (2007)). We have penned that,

> [i]n reviewing the trial court's decision to deny appellant's motion for judgment, we "shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made." Md. Rule 2–519(b) (1995). *See also Oaks v. Connors*, 339 Md. 24, 29 n. 4, 660 A.2d 423 (1995); *Hawes v. Carberry*, 103 Md.App. 214, 217, 653 A.2d 479 (1995). Moreover, the court's determination should be upheld "if there is any evidence, no matter how slight, legally sufficient to generate a jury question." *James v. General Motors Corp.*, 74 Md.App. 479, 484, 538 A.2d 782, cert. denied, 313 Md. 7, 542 A.2d 844 (1988).

*Wash. Metro. Area Transit Auth. v. Reading*, 109 Md.App. 89, 99, 674 A.2d 44 (1996). Essentially, we are tasked with determining "whether there was sufficient evidence to create a jury question." *Saponari v. CSX Transp., Inc.*, 126 Md.App. 25, 37, 727 A.2d 396 (1999). Thus, we must determine whether the evidence presented at trial, viewed in the light most favorable to Strub, compels a finding that Nocar assumed the

under the common law, owe a duty of care to the employees of another subcontractor. *Id.* at 357, 311 A.2d 432. The existence of a common law duty of care is irrelevant to the issue at hand.

risk and/or was contributorily negligent. If reasonable minds could differ, we must affirm the circuit court's decision to submit the case to the jury.

At the conclusion of Strub's case, C & M moved for judgment and argued that Strub failed to put on any evidence that Nocar fell through the holes created by C & M. At that juncture, the court expressed concern that Strub had failed to present any direct evidence regarding how Nocar fell. Specifically, the court observed that Strub did not present any fact witnesses and only presented expert testimony based on their observations of pictures and other evidence. The court pointed out that Strub offered no evidence or theory as to what Nocar was doing when he fell or how he may have fallen, only that he died as a result of falling approximately twenty-six feet from the third floor of the building. At the conclusion of all of the evidence, C & M again moved for judgment arguing that Nocar assumed the risk of falling into the opening by "voluntarily working in close proximity to it." In addition, C & M argued that Nocar was contributorily negligent in pulling the ladder through the opening in the floor, which Leisenring testified was a violation of safety standards, and in placing the rung of the ladder against the stud, as Tudor and Galarnyk testified, which also violated safety standards. Further, C & M argued that Nocar was obligated to utilize a safety belt in using the ladder as a work station and failed to do so.

Opposing C & M's motion, Strub argued that assumption of the risk is a jury question in nearly every case, that there was not sufficient evidence that Nocar was trained in the applicable safety standards and that C & M's theory, based upon Tudor's testimony, that Nocar had pulled the ladder up to the third floor to install a return box was simply speculation. Strub based this conclusion on the fact that Nocar did not take the return box with him on the ladder and that he was not holding a screw driver when he fell and he had specifically been instructed to wait until after lunch to install the return box. Thus, counsel for Strub argued, ". . . for all we know, he pulled the ladder up, saw that the ladder wouldn't fit within the eight-foot ceilings and left it there and started working on

something else and for a different reason that's not negligent fell through the hole."

The court denied the motion, referring to its earlier pronouncement that it preferred not to take a case from a jury, even when it is weak, noting that "this is very problematic in my humble opinion. . . ." C & M seizes upon the trial court's obvious reservations and now argues that there was insufficient evidence to generate a jury question as to either defense.

### Assumption of the Risk

We have iterated that, "[a]lthough the question of whether the plaintiff assumed the risk is normally for the jury, if it is clear that an individual of normal intelligence, in the plaintiff's position, must have understood the danger, then the issue is for the court." *Saponari*, 126 Md.App. at 32, 727 A.2d 396 (citing *Baltimore Gas and Elec. Co. v. Flippo*, 348 Md. 680, 691–92, 705 A.2d 1144 (1998); *Schroyer v. McNeal*, 323 Md. 275, 283–84, 592 A.2d 1119 (1991)). C & M cites *American Powerlifting Ass'n v. Cotillo*, 401 Md. 658, 668, 934 A.2d 27 (2007), which defines assumption of the risk as "a doctrine whereby a plaintiff who intentionally and voluntarily exposes himself to a known risk, effectively, consents to relieve the defendant of liability for those risks to which the plaintiff exposes himself. . . . Assumption of the risk is a defense that completely bars any recovery by the plaintiff." *Id.* The Court of Appeals has penned, *id.*,

[i]n Maryland, there are three requirements that the defendant must prove to establish the defense of assumption of the risk: (1) the plaintiff had knowledge of the risk of danger; (2) the plaintiff appreciated that risk; and (3) the plaintiff voluntarily confronted the risk of danger. *ADM Partnership*, 348 Md. at 90–91, 702 A.2d at 734. In determining whether a plaintiff had the requisite knowledge, an objective standard is applied. *Crews* [*v. Hollenbach*], 358 Md. [627] at 644, 751 A.2d [481] at 490 [ (2000) ].

C & M points out that there was no dispute that Nocar was aware of the stairwell openings, which were approximately seven and one-half feet long and two and one-half feet wide, as

they were obvious to everyone on the worksite. Thus, C & M urges us to hold that it was entitled to judgment as a matter of law because Nocar voluntarily assumed the risk of falling through the opening simply by working "in and around these openings for approximately 3 to 3 ½ hours, using 10 [foot] long wooden ladders to climb through them, carrying tools and ductwork back and forth between the first, second and third floors without protest." C & M cites *ADM P'ship v. Martin*, 348 Md. 84, 702 A.2d 730 (1997), for the proposition that the fact that Nocar was performing the work on the third floor as part of his job duties does not negate the voluntariness of his actions.

While we agree that there was no evidence presented that Nocar protested to working in and around the openings, we decline to hold that the court erred in submitting the issue to the jury because there was no direct evidence offered by either party of what Nocar was doing when he fell. C & M offered a theory that he positioned the ten-foot ladder at an angle in order to accommodate the eight-foot ceiling on the third floor to install a return box that he had previously stated that he intended to do. While plausible, as Strub pointed out before the trial court, Tudor could only testify to what he *thought* Strub may have done based upon their earlier conversation. However, an inference can also be drawn from the facts, as Strub argued, that Nocar obeyed Tudor's instructions and did not attempt to install the return box, based upon the fact that the return box was found on the floor in the hallway.

C & M urges us to follow *Casper v. Smith & Son Inc.*, 71 Md.App. 445, 526 A.2d 87 (1987), where we held that two young children assumed the risk of the serious brain injuries sustained by walking over a frozen body of water and falling through. *Id.* 449–50, 526 A.2d 87. C & M analogizes this case to *Casper* because, in this case, as in *Casper*, there is no evidence of exactly how the accident happened. We opined in *Casper, id.* at 475, 526 A.2d 87:

> While no one will ever know how the accident happened, there is no evidence or even suggestion that they arrived in the water in any other way except by their own actions ...

If they jumped, ran, walked, or crawled onto the ice or even if they leaned over too far into the water from the bank, through their own volition they positioned themselves hazardously close to the open and obvious danger.

We discern important factual distinctions between this case and *Casper*. In traversing a frozen body of water, the children took some action and in doing so, voluntarily assumed a risk of injury. While we did not know precisely what that action was, we knew that the children somehow positioned themselves on the ice in order for the ice to break and for them to fall through. C & M presents this court with no authority for the proposition that, by virtue of working in a building with a twenty-six foot deep opening, Nocar assumed the risk of falling through. C & M theorizes that the evidence makes clear that,

> [w]ithin minutes of when the accident occurred, Nocar had 'stuck his head' far enough down the same third-floor stairwell opening into which he would soon fall, that he made eye contact with Tudor ... He asked Tudor to hand him up a step ladder. When he realized that Tudor was still using it, he said 'F* * *it, I'll climb the B* * *.' He removed the nail that had been holding the 10' ladder in place in the stairwell opening, and pulled the ladder up to the third floor, placing it at an angle with its feet on an outside wall ledge and its top rung against an interior metal stud, so that it spanned over the center of the stairwell opening.

> Nocar's purpose in positioning the ladder there was to install a return box in the third floor hallway ceiling's ductwork, immediately adjacent to the stairwell opening. The evidence before the jury was that Nocar was on the ladder when it bent the metal stud, causing the ladder to twist. Whether that happened when he was just stepping onto it or from it or as he was climbing up or down, it is, unknown, but irrelevant.

Whether Nocar actually climbed the ladder across to the opening, or whether he obeyed the instruction of his superior

to wait until after lunch to install the return and fell for some other reason was for the jury to decide.

### Contributory Negligence

Alternatively, C & M asserts that it was entitled to judgment in its favor because Nocar was contributorily negligent as a matter of law. Like assumption of the risk, "[g]enerally, the issue of contributory negligence is for the jury as long as 'there is a conflict of evidence as to material facts relied on to establish contributory negligence, or more than one inference may be reasonably drawn therefrom.'" *Saponari*, 126 Md.App. at 37, 727 A.2d 396 (quoting *Flippo*, 348 Md. at 703, 705 A.2d 1144). C & M cites the same conduct that it alleges constitutes assumption of the risk to support his claim of contributory negligence. We have explicated that,

... "in order to establish contributory negligence as a matter of law, 'the evidence must show some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds.'" *Id.* (quoting *Reiser* [*v. Abramson* ], 264 Md. [372] at 378 [286 A.2d 91 (1972) ] ). We also must "give due consideration not only to all inferences of fact tending to support the opposite view, but also to the important presumption that [the decedent] exercised ordinary care for [her] own safety." *Pachmayr v. Baltimore & Ohio R.R. Co.*, 157 Md. 256, 262, 145 A. 611 (1929) (citations omitted).

*Id.*

C & M argues that the presumption that Nocar exercised due care has been rebutted by "proof to the contrary," citing *Bratton v. Smith*, 256 Md. 695, 703–04, 261 A.2d 777 (1970). We decline to hold that the presumption has been rebutted for the same reason that we find that the issue of assumption of the risk was properly submitted to the jury. It was for the jury to decide whether Nocar in fact brought the ladder up to the third floor and climbed it, as argued by C & M. Accordingly, we affirm the trial court's denial of appellees' motion for judgment.

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY AFFIRMED, IN PART, AND REVERSED, IN PART.

CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

COSTS TO BE PAID FIFTY PERCENT (50%) BY AP-PELLANT/CROSS–APPELLEE AND FIFTY PERCENT (50%) BY APPELLEE/CROSS–APPELLANT.